No. 15-1372

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

CHRISTOPHER R. SEALS,

*Appellant,*

V.

UNITED STATES OF AMERICA,

*Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana
(Hon. Theresa L. Springmann, No. 13-cr-00046)

**OPENING BRIEF AND REQUIRED SHORT APPENDIX
OF APPELLANT CHRISTOPHER R. SEALS
REDACTED, PUBLIC VERSION**

Justin B. Weiner
*Counsel of Record*
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 450-6700 (telephone)
(312) 450-6701 (facsimile)
jweiner@mololamken.com

*Counsel for Appellant
Christopher R. Seals*

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: 15-1372

Short Caption: United States of America v. Christopher R. Seals

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Christopher R. Seals



(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

MoloLamken LLP

Michelle F. Kraus

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/Justin B. Weiner                          Date: 8/5/15

Attorney's Printed Name:  Justin B. Weiner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☒    **No** _____

Address:  300 N. LaSalle St.

Chicago, IL 60654

Phone Number: 312-450-6700          Fax Number:  312-450-6701

E Mail Address:  jweiner@mololamken.com

rev. 01/08 AK

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................ 1

ISSUES PRESENTED ................................................................................ 1

STATEMENT OF THE CASE ..................................................................... 2

   I.   Factual Background .......................................................................... 2

   II.  Proceedings Below .......................................................................... 3

       A.   The Pre-Trial 404(b) Ruling ...................................................... 3

       B.   The Trial ................................................................................... 5

           1.   *The Government's Principal Evidence* ................................ 5

           2.   *The 404(b) Evidence* ......................................................... 8

           3.   *Christopher's Defense* ....................................................... 9

       C.   The Verdict and Sentencing ..................................................... 10

SUMMARY OF ARGUMENT ................................................................... 11

ARGUMENT .............................................................................................. 13

   I.   The District Court Erred by Admitting Improper Propensity Evidence of the Credit Union Incident .................................................. 13

       A.   Standard of Review .................................................................. 14

       B.   The District Court Did Not Properly Exercise Its Discretion Regarding the Credit Union Incident Evidence .......................... 14

           1.   *The District Court Failed To Exercise Discretion* .................. 14

           2.   *Both Rule 404(b) and Rule 403 Required Excluding the Credit Union Incident* .............................................................. 16

       C.   The Error Was Not Harmless .................................................... 18

           1.   *The Government's Case Was Significantly Less Persuasive Without the Propensity Evidence* ......................................... 18

           2.   *A Limiting Instruction Could Not Cure the Prejudice* ............ 22

   II.  The Two-Level Enhancement for Reckless Endangerment During Flight Was Plain Error ...................................................................... 23

       A.   Standard of Review .................................................................. 23

       B.   The Enhancement Cannot Apply to the Car Chase in Which Christopher Was a Passenger .................................................... 24

       C.   The Enhancement Cannot Apply to the Flight on Foot .............. 26

   III.  The Four-Level Enhancement for Use of a Firearm "in Connection with" Another Felony Was Plain Error ............................................. 26

       A.   Standard of Review .................................................................. 27

B.   The Enhancement Should Not Apply Because Christopher Did Not Commit "Another Felony" ........................................................ 27

C.   The Enhancement Should Not Apply Because the Firearms in the Infiniti Were Not Used in Connection with the Flight ............................ 28

CONCLUSION............................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Davis v. State*, 835 N.E.2d 1102 (Ind. Ct. App. 2005) ................................. 28

*Rosemond v. United States*, 134 S. Ct. 1240 (2014)................................... 28

*Smith v. United States*, 508 U.S. 223 (1993) ............................. 12, 13, 29

*United States v. Billups*, 536 F.3d 574 (7th Cir. 2008) ........................ 23, 27

*United States v. Boone*, 628 F.3d 927 (7th Cir. 2010) ............................... 18

*United States v. Byrd*, 689 F.3d 636 (6th Cir. 2012) ................................. 24

*United States v. Cespedes*, 663 F.3d 685 (3d Cir. 2011) ........................... 24

*United States v. Chong*, 285 F.3d 343 (4th Cir. 2002).............................. 24

*United States v. Clark*, 774 F.3d 1108 (7th Cir. 2014) ................. 15, 21, 22

*United States v. Conley*, 131 F.3d 1387 (10th Cir. 1997) .......................... 24

*United States v. Doss*, 741 F.3d 763 (7th Cir. 2013)........................ 24, 25, 28

*United States v. Franklin*, 321 F.3d 1231 (9th Cir. 2003)......................... 25

*United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) .......................*passim*

*United States v. Gould*, 529 F.3d 274 (5th Cir. 2008) ............................... 26

*United States v. Johns*, 732 F.3d 736 (7th Cir. 2013) ........................ 23, 27

*United States v. Johnson*, 694 F.3d 1192 (11th Cir. 2012)........................ 24

*United States v. Klebig*, 600 F.3d 700 (7th Cir. 2009)............................... 18

*United States v. Lard*, 327 F.3d 551 (7th Cir. 2003) ............................... 26

*United States v. LePage*, 477 F.3d 485 (7th Cir. 2007) ............................ 30

*United States v. Loughry*, 660 F.3d 965 (7th Cir. 2011)............................ 18

*United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007)............................. 14

iii

*United States v. McCrimon*, 788 F.3d 75 (2d Cir. 2015) ................................ 12, 24, 25

*United States v. McNeair*, 523 F. App'x 258 (4th Cir. 2013) ...................................... 29

*United States v. Miller*, 673 F.3d 688 (7th Cir. 2012) .................................... 14, 18, 22

*United States v. Montgomery*, 599 F. App'x 594 (7th Cir. 2015) ............................... 31

*United States v. Owens*, 424 F.3d 649 (7th Cir. 2005) ......................................... 20, 21

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938) .............................................. 28

*United States v. Reyes-Oseguera*, 106 F.3d 1481 (9th Cir. 1997) ........................ 12, 26

*United States v. Richards*, 719 F.3d 746 (7th Cir. 2013) ............................................ 17

*United States v. Saunders*, 166 F.3d 907 (7th Cir. 1999) ........................................... 14

*United States v. Schmitt*, 770 F.3d 524 (7th Cir. 2014) ............................................. 29

*United States v. Simpson*, 479 F.3d 492 (7th Cir. 2007) ............................................ 18

*United States v. Stacy*, 769 F.3d 969 (7th Cir. 2014) ................................................ 14

*United States v. Suggs*, 624 F.3d 370 (7th Cir. 2010) ............................................... 31

*United States v. Vargas*, 689 F.3d 867 (7th Cir. 2012) .............................................. 18

*United States v. Wyatt*, 102 F.3d 241 (7th Cir. 1996) ............................................... 30

*United States v. Young*, 33 F.3d 31 (9th Cir. 1994) .................................................. 24

*Watson v. United States*, 552 U.S. 74 (2007) ..................................................... 29, 30

**Statutes**

18 U.S.C. § 2 ...................................................................................................... 1

18 U.S.C. § 922 ................................................................................................ 1, 3

18 U.S.C. § 924 ........................................................................................... 1, 3, 29

18 U.S.C. § 2113 ............................................................................................... 1, 3

18 U.S.C. § 3231 .................................................................................................. 1

18 U.S.C. § 3742 .................................................................................................. 1

iv

28 U.S.C. § 1291 ............................................................................................. 1

IC 35-44.1-3-1 ........................................................................................ 27, 28

**Federal Rules**

Fed. R. Crim. P. 52 ...................................................................................... 18

Fed. R. Evid. 403 ............................................................................. 12, 15, 17

Fed. R. Evid. 404 ................................................................................. *passim*

**United States Sentencing Guidelines**

U.S.S.G. § 2K2.1 ................................................................................. *passim*

U.S.S.G. § 3C1.2 ................................................................................. *passim*

## JURISDICTIONAL STATEMENT

The District Court for the Northern District of Indiana had jurisdiction in this criminal prosecution under 18 U.S.C. § 3231. A grand jury charged Christopher R. Seals in a three-count indictment under 18 U.S.C. § 2113(a) and (d) and 18 U.S.C. § 2, 18 U.S.C. § 924(c), and 18 U.S.C. § 922(g)(1) on February 14, 2013. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court entered a judgment against Christopher on February 23, 2015.[1] SA40. Christopher timely filed his notice of appeal on February 25, 2015. Dkt. 95.

## ISSUES PRESENTED

Three men wearing masks robbed a PNC Bank in Fort Wayne, Indiana on February 14, 2013. The primary issue at trial was whether Christopher Seals was one of these men. This appeal concerns Federal Rule of Evidence 404(b) and the application of two Sentencing Guideline enhancements. There are three issues raised in this appeal:

1.     Weeks after the PNC robbery, masked men were spotted approaching the Three Rivers Federal Credit Union, over six miles from the PNC. The men ran off, but a mask was recovered at the scene; DNA found on the mask matched Christopher Seals. At trial for the PNC robbery, the Government introduced evidence that Christopher was one of the masked men behaving suspiciously near the Credit Union. Was the evidence of Christopher's possible involvement in this alleged, uncharged attempted bank robbery improper propensity evidence?

---

[1] Both Christopher Seals and his brother, Charles Seals, figure into the facts of this case. Accordingly, to avoid confusion the brief refers to each by first name.

2.    The district court applied a two-level Guideline enhancement for "reckless endangerment during flight."  Weeks after the PNC robbery, Christopher was riding as a passenger in an Infiniti sedan driven by his brother, Charles Seals. The police attempted to stop the Infiniti, and Charles sped off.  The Infiniti crashed and both Charles and Christopher allegedly fled on foot.  Every appellate court to consider whether reckless endangerment applies to passengers in vehicles has required evidence of active participation in the flight.  Every appellate court to consider this Guideline's application to flight on foot has held that running from police, on its own, is insufficient.  Was it plain error to apply the enhancement when there was no evidence that Christopher encouraged Charles to flee and no evidence that Christopher created a substantial risk of harm by running away?

3.    The district court applied a four-level Guideline enhancement for use of a firearm "in connection with" another felony, because the Infiniti contained guns during Charles' flight from police.  Indiana makes it a felony to use a vehicle to flee from the police or to aid and abet such a flight.  The Sentencing Guidelines define "in connection with" another felony to mean "facilitate or have the potential to facilitate" the felony.  Was it plain error to apply the enhancement when there was no evidence that Christopher aided and abetted Charles' flight and when the presence of the guns in the Infiniti was merely coincidental to the chase?

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

On February 14, 2013, three men robbed a PNC Bank in Fort Wayne, Indiana.  A11:20-A12:9.  Wearing masks and carrying guns, the men took money

from a teller's drawer and from the bank's vault. *Id.* A13:22-A15:8; A16:23-A17:25. The Government indicted Christopher Seals and charged him with committing the robbery. Dkt. 11.

On September 19, 2014, Christopher was convicted of armed robbery (18 U.S.C. § 2113), brandishing a firearm during a crime of violence (18 U.S.C. § 924(c)), and possessing a firearm after a felony conviction (18 U.S.C. § 922(g)(1)). SA40; Dkt. 94. Each of these convictions stems from the robbery of a PNC Bank in Fort Wayne, Indiana on February 14, 2013. SA40. During the course of trial, however, the Government introduced evidence relating to an event subsequent to the PNC robbery: an alleged attempt to rob a different bank six miles from the PNC. A29:17-A30:15. The evidence related to this subsequent event, and the Guideline enhancements applied based on the chase are the focus of this appeal.

## II.   PROCEEDINGS BELOW

### A.   The Pre-Trial 404(b) Ruling

Approximately one month after the PNC robbery, employees at the Three Rivers Federal Credit Union in Fort Wayne noticed men creeping through the woods toward the Credit Union. A2:9-A3:4. Witnesses testified at an evidentiary hearing that they observed only two men, though one witness testified that he may have seen a third. *Id.* A4:23-25; A5:22-A6:4. When a customer came outside to investigate, the men fled. *Id.* A5:2-14. Police then came to the scene and collected two masks, one white and one black. *Id.* A7:13-19. A hair recovered from the black mask matched Christopher's DNA. A38:14-A39:19.

3

Before trial, the Government provided notice that it intended to introduce evidence that implicated "other acts" under Federal Rule of Evidence 404(b). Dkt. 38. Specifically, the Government stated that it intended to provide evidence not only of the mask collected nearby the Credit Union, but also evidence of "the circumstances of the attempted robbery." Dkt. 38 at 10. The Government "acknowledge[d] that there is probably not enough information to present [the PNC and Three Rivers] robberies as" conforming to a "*modus operandi*." *Id*. Nevertheless, the Government asserted that the circumstances of the Credit Union incident were probative of Christopher's identity as one of the PNC robbers. *Id*. at 10-11. According to the Government, the Credit Union incident "demonstrate[d] that the recovered mask ***was a bank robbery mask*** and not some mask used by [Christopher] Seals for some legitimate purpose." *Id*. at 11 (emphasis added). In its reply brief, the Government retreated slightly and limited the evidence it sought to admit to "testimony from the officers concerning their arrival at the [Credit Union] in order to investigate the sighting of masked individuals in the woods and their subsequent collection of the relevant mask." Dkt. 45 at 4.

Christopher made a pre-trial objection to the evidence relating to the Credit Union incident. Dkt. 33. The district court, ruling before this Court's decision in *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (*en banc*), overruled Christopher's objections. The district court found that "the probative value of the [mask and DNA evidence] is very high, as it goes toward identifying the Defendant as wearing the mask." SA10. "[T]o reduce the risk of unfair prejudice," however,

the district court ruled that "the details of the masked individuals' behavior prior to the arrival of the police will not be admitted." *Id*. Nevertheless, the district court ruled that "the fact that police responded to the area of the Three Rivers Federal Credit Union to investigate suspicious behavior, and recovered a mask with the Defendant's DNA, is admissible." *Id*. The district court did not discuss the relevance of these facts, and it did not assess their prejudicial effect. *Id*.

**B.    The Trial**

1.    *The Government's Principal Evidence*

At trial, the Government called PNC bank employees who described the robbery. *See, e.g.*, A13:22-A15:8; A16:23-A17:25. Because the perpetrators were wearing masks, the employees could not see the faces of the robbers or even identify their race. A22:4-8. The employees did establish that one of the men left a gun on the floor of the bank's vault. A21:2-6. Police later tested it for DNA evidence. A31:5-A33:15. The bullets in the gun contained DNA that matched Christopher's, but the gun itself did not. A34:14-23; A35:4-10; A36:13-A37:1. The testing suggested that three different people had handled the gun itself, but the DNA on the gun could not be matched to any particular person. *Id*.

A surveillance camera captured parts of these events on tape. A10:6-19. No witness attempted to identify Christopher from the tape. No testifying witness observed the men leave or saw a getaway vehicle. A24:15-A25:12 (first responding police officer testifying that he did not see getaway car). The men made off with over a hundred thousand dollars. A18:23-A19:3. The robbers also stole "bait

5

money"—bills marked with serial numbers recorded by the bank.  A20:6-25.  None of the bait money was recovered.  A88:24-A89:6.

Deyante "Pooter" Stephens—a cooperating witness for the Government testifying in exchange for a more lenient sentence—testified about what took place after the robbery.  A46:5-A54:20.  Pooter testified that he had been recruited to assist with the robbery by Christopher's brother, Charles Seals.  A45:20-23.  According to Pooter, Charles called him on the day of the robbery and instructed him to meet Charles in the parking lot of a grocery store.  A46:15-A47:5.  Charles arrived driving a black Infiniti with Christopher in the passenger seat.  A47:14-A48:15.  Charles got into Pooter's car, handed him a book bag, and left.  A50:1-10.  Pooter testified that he opened the bag and saw money.  A51:1-17.  Later, Charles came to Pooter's mother's house alone to collect the money.  A57:3-5.

Pooter did ***not*** testify that Christopher participated in the robbery.  A55:9-11.  Pooter had no communication with Christopher about the robbery.  A58:12-14.  Indeed, Pooter testified that Charles attempted to recruit Pooter to help with the robbery on multiple occasions.  A57:19-A58:14.  Christopher was present on one of those occasions, but Pooter did not testify that Christopher was part of the planning or said anything incriminating during that conversation.  *Id.*

The Government also introduced evidence of a chase involving Charles' Infiniti that took place weeks after the PNC robbery.  A60:1-9.  On March 20, a Fort Wayne police officer went in search of Charles' black Infiniti.  A83:4-A84:10.  He found it driving through an apartment complex and activated his emergency lights.

6

A84:21-24.  The Infiniti fled, and the police pursued.  A84:25-A85:7.  The Infiniti then crashed and the driver and front-seat passenger fled.  A61:10-21.  One passenger remained in the back seat.  A62:19-24.

Fort Wayne Police Officer Jason Brown testified that he was involved in the chase of the Infiniti.  A59-60.  Brown chased the Infiniti until it did "not stop at the stop sign . . . fl[ew] through [an] intersection and then wreck[ed] out shortly after that."  A60:19-24.  Brown testified that he reached a speed of "45 or 50" miles per hour before the chase ended.  A61:2-3.  He described the wreck in detail:

> It struck 2 parked cars that were facing northbound.  They were on the east side of the street.  Struck both of the parked cars then spun out and it basically ended up all wrecked out right in the middle of the street on Bowser.

A61:12-15.  He saw two men flee the crashed vehicle.  A62:17-18.

A second Fort Wayne Police Officer, Christopher Meihls, testified about the search of the wrecked Infiniti.  A64.  During Meihls' testimony, the Government introduced photos of the wrecked car into evidence.  A65:9-13.  The Government also introduced evidence of the various items found in the Infiniti, including a black ski mask.  A68:17-20; A77:25-A78:20; A80:10-15.  Unlike the ski mask found in the woods near the Three Rivers Federal Credit Union, the Government did not introduce any evidence that the ski mask found in the Infiniti was tested for Christopher's DNA.  A117:23-A118:8 (acknowledging no DNA testing of the mask found in the Infiniti).

The Government also introduced an edited audio recording of an FBI interview of Christopher.  Ex. 49.  On May 1, 2013, Christopher voluntarily sat for

an interview with the FBI.  A87:6-21.  When confronted with the report of his DNA on the bullets, Christopher admitted to loading the gun.  Ex. 49 at 16:10-16:20.  But he steadfastly denied participating in the PNC robbery.  *Id.* at 15:20.  Though Charles had sought Christopher's help with the robbery, Christopher had refused to participate.  *Id.* at 26:10-26:30.  Instead, Christopher was told by Charles to "be quiet" about the robbery in exchange for cash.  *Id.* at 24:45.

> 2.    *The 404(b) Evidence*

Christine Armstead, a Fort Wayne police officer, was called to testify about the mask found outside the Credit Union, and the circumstances that led her to collect the mask.  A26.  Armstead testified that she was "dispatched to a suspicious person's report" on March 13.  A29:24-A30:1.  The Government then established the circumstances that prompted the call:

> Q:  Okay.  And was that a report of some individuals in the woods wearing masks?
>
> A:  Yes, low crawling towards the bank in the wood line.
>
> Q:  Were you assisted by any K-9 officers?
>
> A:  Yes.  When I arrived, I went to the bank to speak with the tellers to get more information.

A30:10-15.  Later in the trial, the Government presented the DNA evidence linking Christopher to the mask found in the woods.  A40:23-A41:5.  At closing argument, the Government initially said that the circumstances leading to the mask's recovery were not important, but then repeated the argument that it made in pre-trial briefing:  "[W]e've already got Christopher Seals' ***bank robbery mask***, because he left it behind in the woods out there on Bluffton Road."  A118:6-8 (emphasis added).

3.    *Christopher's Defense*

At trial, two witnesses corroborated Christopher's denial of involvement in the robbery.  James Anthony Williams testified that Christopher spent February 14—the day of the robbery—at a house at ██████ ██████ in Fort Wayne.  A98:6-10. Williams spent all of February 13 at home, playing video games into the morning of February 14 until around 6:00 a.m.  A100:15-24.  Williams then slept from 6:00 a.m. until around 2:00 p.m. on February 14.   A101:14-17.  Williams saw Christopher at the ██████ house both when he went to sleep and when he awoke, and Williams understood that Christopher had been at the ██████ house throughout the morning.   A100:25-A101:3; A102:3-12.   Indeed, Christopher did not leave the ██████ house until evening on February 14.  A103:3-6.  Williams did not, however, see either Charles or Pooter on either February 13 or 14.  A100:10-14; A102:13-16.

Cequella Whitt was also at the ██████ house on February 13 and 14. A107:5-20.  Whitt also saw Christopher at the ██████ house the night of the 13th into the early morning of the 14th.  A108:21-A109:21.  Unlike Williams, however, Whitt awoke at around 7:00 a.m. on the 14th to feed her baby daughter.  A109:18-A110:8.  When Whitt woke, she saw Christopher sleeping on a couch.  A110:14-20. Whitt saw Christopher wake at around 8:30 or 9:00 a.m.—roughly the same time that the robbery of the PNC began.   A111:19-A112:4.   Whitt testified that Christopher was outside the ██████ house playing basketball at the time of the robbery; a fact that Whitt sharply recalled because her boyfriend had joined Christopher outside, even though it was Valentine's Day.  A112:5-25.  Christopher did not leave the ██████ premises on the 14th until he and his girlfriend went to

see a movie.  A113:1-2.  Whitt also did not see Charles or Pooter at the ████

house that day.  A113:3-10.

### C.    The Verdict and Sentencing

The jury returned a verdict of guilty on all three counts.    Dkt. 94.
Christopher's base offense level was 20.  SA35.  The district court then included
multiple enhancements to this offense level.

Two of these enhancements pertained to the chase of the Infiniti.  At trial, no
witness testified about the actions of any of the Infiniti's occupants during the
chase.  Evidence presented at a pre-trial hearing indicated that Charles Seals, not
Christopher, drove the Infiniti during the chase.  A8:4-6.  Otherwise, the record
lacks any indication of what the occupants of the car were doing during the chase.
For example, there was no evidence—at trial, sentencing, or otherwise—that
Christopher had any role in encouraging Charles to speed away from the police, and
the district court made no findings of fact about Christopher's role (or lack thereof)
in the chase.  SA18-19.

Nevertheless, the district court imposed a four-level enhancement under
U.S.S.G. § 2K2.1(b)(6)(B) for use or possession of "any firearm or ammunition in
connection with another felony offense."  SA29.  The district court held that the fact
that the Infiniti contained guns satisfied this guideline.  SA30.  Specifically, the
district court found that "the presence of the gun and the ammunition in the vehicle
facilitated, or had the potential of facilitating, the other felony offense of resisting
law enforcement through flight in a vehicle."  SA30-31.

The district court also applied a two-level enhancement for "Reckless Endangerment During Flight" under U.S.S.G. § 3C1.2, based on the car chase. SA22. The district court found that it was "of no consequence that the Defendant **was the front seat passenger and not the driver**, because after the chase and crash, the Defendant and his brother both continued to flee from the scene and the evidence . . . ." SA24 (emphasis added). From this, the district court concluded "that the **Defendant's high-speed flight** from the police recklessly endangered the public and the police." *Id.* (emphasis added).

The district court calculated Christopher's offense level at 34. SA35. This corresponded to a guideline range of 188 to 235 months. The district court sentenced Christopher to 188 months of imprisonment on Count 1, seven years of imprisonment on Count 2 running consecutive to Count 1, and 120 months on Count 3 running concurrent to Count 1. SA39. Christopher was thus sentenced to a total of 22 years and 8 months of prison time.

## SUMMARY OF ARGUMENT

I.      The district court erred by admitting evidence that masked men were spotted acting suspiciously near another bank—the Three Rivers Federal Credit Union. That was propensity evidence, with no logical connection to the allegations of robbery of the PNC Bank. The circumstances leading to the seizure of the mask are not probative of Christopher's identity in the PNC robbery; they only suggest that Christopher had a propensity for robbing banks. Moreover, to the extent the evidence had any probative value, it was far outweighed by the prejudicial effect of

11

the evidence.  The evidence was therefore inadmissible under both Rule 404(b) and Rule 403.

II.    The district court erred by applying section 3C1.2's two-level enhancement for reckless endangerment during flight.  Although this Court has not yet considered the issue, six circuits have held that the enhancement does not apply to a passenger in a car unless there is evidence of "'some form of direct or active participation'" in the flight by the passenger.  *United States v. McCrimon*, 788 F.3d 75, 79 (2d Cir. 2015) (collecting cases).  The Second Circuit has held that this proposition is so well-established that violating it is a plain error.  *Id.*  Here, there was no evidence that Christopher had any "direct or active participation" in Charles' attempt to evade the police.

Nor can Christopher's subsequent flight on foot qualify for the enhancement.  "[F]light on foot from law enforcement is insufficient on its own to justify the application of section 3C1.2."  *See, e.g.*, *United States v. Reyes-Oseguera*, 106 F.3d 1481, 1483 (9th Cir. 1997).  Rather, there must be some additional conduct that creates a substantial risk of injury to others.  The Government presented no evidence that Christopher's running from the Infiniti created such risk.

III.    The district court erred by applying section 2K2.1(b)(6)'s four-level enhancement for use of a firearm in relation to another felony—in this case, the chase of the Infiniti.  A firearm is used "in relation to" another felony when it facilitates or has the potential to facilitate another felony offense.  *Cf. Smith v. United States*, 508 U.S. 223, 238 (1993) (interpreting statute with similar words as

Guideline).  The presence or involvement of the firearm cannot be the result of accident or coincidence.  *Id.*  Here, no evidence suggested that the presence of firearms in the car was anything but coincidentally related to Charles' high-speed getaway.  Furthermore, the evidence was not sufficient to show that Christopher had committed the felony of fleeing from the police while using a vehicle.

## ARGUMENT

### I.  THE DISTRICT COURT ERRED BY ADMITTING IMPROPER PROPENSITY EVIDENCE OF THE CREDIT UNION INCIDENT

At trial, the district court admitted evidence that Christopher had participated in an uncharged attempted robbery of the Three Rivers Federal Credit Union:

> Q:  Okay.  And was that a report of some individuals in the woods wearing masks?
>
> A:  Yes, low crawling towards the bank in the wood line.
>
> Q:  Were you assisted by any K-9 officers?
>
> A:  Yes.  When I arrived, I went to the bank to speak with the tellers to get more information.

A30:10-15.[2]  In its pre-trial ruling admitting this evidence, the district court failed to undertake any analysis of the probative value of this testimony or its prejudicial effect.  This failure necessitates a new trial for Christopher.

---

[2] The testimony at trial went beyond what the district court had ordered.  The court's order limited the testimony to "the fact that police responded to the area of the Three Rivers Federal Credit Union to investigate suspicious behavior, and recovered a mask with . . . [Christopher]'s DNA."  SA10.  The testimony that the men were "low crawling toward the bank" goes beyond that order, though Christopher's attorney did not object at trial or seek a curative instruction.

## A.    Standard of Review

Christopher properly preserved his objection to the evidence of suspicious circumstances near the Credit Union.  Prior to trial, Christopher filed a written objection to the evidence.  Dkt. 33, 44.  Christopher renewed the objection during trial.  A26:15-A28:17.  When a defendant properly objects to an evidentiary ruling, this Court reviews the district court's decision for abuse of discretion.  *Gomez*, 763 F.3d at 858.  "A district court abuses its discretion when it commits an error of law or makes a clearly erroneous finding of fact."  *United States v. Mannie*, 509 F.3d 851, 856 (7th Cir. 2007).  Furthermore, the failure to exercise discretion is itself an abuse of discretion.  *United States v. Saunders*, 166 F.3d 907, 917 (7th Cir. 1999).

## B.    The District Court Did Not Properly Exercise Its Discretion Regarding the Credit Union Incident Evidence

### 1.    *The District Court Failed To Exercise Discretion*

The district court failed to exercise its discretion and erred by failing to apply *Gomez* to the Credit Union incident.[3]  Federal Rule of Evidence 404(b) prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted with the character."  Fed. R. Evid. 404(b)(1).  Such evidence "may be admissible for another

---

Accordingly, Christopher does not rely on that limited part of the testimony in his appeal.

[3] The district court issued its pre-trial decision prior to *Gomez*.  Nevertheless, this Court applies *Gomez*'s two-part test to review decisions that pre-date *Gomez*.  *See, e.g.*, *United States v. Stacy*, 769 F.3d 969, 975-76 (7th Cir. 2014).  Moreover, Christopher renewed his objection to the evidence at trial, which took place after *Gomez*, and the district court did not change its ruling.  A26-28.  Finally, pre-*Gomez* cases impose substantially the same requirements, albeit in a test with a different formulation. *See, e.g.*, *United States v. Miller*, 673 F.3d 688, 702 (7th Cir. 2012).

purpose," including to prove "identity." Fed. R. Evid. 404(b)(2). The proponent of this evidence, however, must first establish its relevance "through a chain of reasoning that does not rely on the forbidden [propensity] inference." *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014) (*en banc*). Even if the proponent makes this showing, the "[o]ther-act evidence raises **special concerns** about unfair prejudice." *Id.* at 857 (emphasis added). Accordingly, "the district court must in every case assess whether the probative value of the other-act evidence is **substantially** outweighed by the risk of unfair prejudice" under Rule 403. *Id.* A district court must "adequately spell out its reasons for admitting . . . Rule 404 evidence." *United States v. Clark*, 774 F.3d 1108, 1116 (7th Cir. 2014). The district court failed to do so here.

The district court did not analyze whether the Credit Union incident was admissible under either Rule 404(b) or Rule 403. Instead, the district court confined its analysis to whether the mask found in the woods and the DNA evidence retrieved from the mask were admissible. SA10 ("The probative value of the evidence is very high, as it goes toward identifying the Defendant as wearing the mask."). But the admissibility of the mask and DNA evidence were not in dispute. Christopher conceded that the mask and DNA evidence were admissible. Dkt. 44 at 2. It was the events leading to the mask's recovery—the "suspicious behavior" near a different bank that prompted a call to the police—that implicated Rule 404(b). The district court's opinion did not identify a non-propensity use for that evidence, did not assess the probative value of that use, and did not weigh that probative

value against the prejudice of linking Christopher to a different bank robbery. SA10. Those omissions were an abuse of discretion.

The district court did limit the scope of the evidence: The Government was forbidden from showing that masked men were seen crawling toward the bank, but it was permitted to introduce "the fact that police responded to the area of the Three Rivers Federal Credit Union to investigate suspicious behavior, and recovered a mask with . . . [Christopher]'s DNA." SA10. That did not cure the error. Even the more limited evidence allowed the jury to infer that Christopher had designs on or was executing a robbery of a different bank—another "crime" or "wrong" from which a propensity to robbery could be inferred.

> ### 2. *Both Rule 404(b) and Rule 403 Required Excluding the Credit Union Incident*

Correctly applying *Gomez* requires excluding the evidence of the Credit Union incident. "Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *Gomez*, 763 F.3d at 856. The Government disclaimed reliance on the Credit Union incident as a "*modus operandi*," acknowledging that there was likely not enough evidence to support that theory. Dkt. 38 at 10. Instead, the Government relied explicitly on the forbidden propensity inference to support the admissibility of the evidence:

> [T]he circumstances of the attempted robbery nevertheless are relevant for identifying Seals as the perpetrator of the PNC robbery because these circumstances further demonstrate that the recovered mask ***was a bank robbery mask*** and not some mask used by Seals for some legitimate purpose.

16

Dkt. 38 at 10-11.  There is no such thing as a "bank robbery mask" under the Federal Rules.  Arguing that Christopher owns a "bank robbery mask" is a backhanded way of saying that Christopher is guilty because he is a "bank robber."  Rule 404(b) does not permit that sort of argument.  *See United States v. Richards*, 719 F.3d 746, 764 (7th Cir. 2013) (holding that labeling a defendant a "drug dealer" was improper propensity argument).  When the district court allowed evidence of the Credit Union incident, it invited the jury to use the same impermissible logic that the Government argued for pre-trial—Christopher robs banks; therefore he robbed the PNC.  That was error.

Even if evidence of the Credit Union incident had some probative value, it was minimal and insufficient to outweigh the prejudice of the evidence to Christopher.  Rule 403 would thus also require exclusion of the mask.  *Gomez*, 763 F.3d at 860 (courts considering propensity evidence must conduct Rule 403 analysis).  Probative value depends in part upon "the degree to which the non-propensity issue actually is disputed in the case."  *Gomez*, 763 F.3d at 857.  The Government asserted that the Credit Union incident was relevant to prove the mask had no legitimate purpose, but Christopher did not argue that the mask had a legitimate purpose.  The Government's stated "non-propensity issue" was thus not disputed, rendering the probative value of the Credit Union incident vanishingly small.  Stacked against the prejudicial propensity inference, the probative value did not "substantially outweigh" its prejudicial effect and so was inadmissible under Rule 403.

### C.      The Error Was Not Harmless

Evidentiary errors are subject to review for harmlessness, and this Court will only grant a new trial if an error was not harmless. Fed. R. Crim. P. 52(a). An evidentiary error is not harmless if "'in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded.'" *Gomez*, 763 F.3d at 863 (quoting *United States v. Vargas*, 689 F.3d 867, 875 (7th Cir. 2012)). Even when there is sufficient evidence to convict (absent the improperly admitted evidence), an error is not necessarily harmless. *United States v. Loughry*, 660 F.3d 965, 975 (7th Cir. 2011) (reversing conviction when evidence "help[ed] to suggest" guilt but did not "necessarily" require a conclusion of guilt); *United States v. Klebig*, 600 F.3d 700, 722 (7th Cir. 2009) (reversing conviction when evidence "was not so strong that we can be confident that the jury would have convicted . . . in the absence of [the] errors"). Indeed, "it is not enough to say that the outcome probably would have been the same without the . . . improper propensity inference." *United States v. Simpson*, 479 F.3d 492, 505 (7th Cir. 2007) (abrogated on other grounds by *United States v. Boone*, 628 F.3d 927, 933 (7th Cir. 2010)). "Doubts—a lack of 'fair assurance'—call for a new trial." *United States v. Miller*, 673 F.3d 688, 701 (7th Cir. 2012).

### 1.      *The Government's Case Was Significantly Less Persuasive Without the Propensity Evidence*

The Government's case would have been significantly less persuasive without the evidence of the Credit Union incident. The jury heard conflicting evidence about whether Christopher was one of the robbers at the PNC. The Government

submitted evidence connecting Christopher to the PNC: DNA on the bullets in the gun found in the bank (A35:6-10), Pooter's testimony (A42), Christopher's personal belongings found near the loot in the Infiniti (A81:15-A82:10), and Christopher's interview (Ex. 49). But the Government's case had flaws, and none of its evidence conclusively established Christopher's participation in the PNC robbery.

Pooter was the Government's only witness who was part of the robbery, but even he did not testify that Christopher participated in the robbery. A55:9-11. Instead, Pooter testified that Charles recruited him to take possession of the loot after the robbery. A44:22-A45:7; A58:1-14. Pooter had no communication with Christopher about the robbery. A58:12-14. Indeed, Pooter testified that Christopher was present when Charles recruited him to the robbery, but Pooter did not testify that Christopher was part of the planning or that Christopher said anything incriminating during that conversation. A56, A58. Pooter merely testified that he drove to a parking lot near the PNC, where Charles met with him and handed him a bag of money. A49:24-A51:3. According to Pooter, Christopher was with Charles at that time, but Pooter provided no evidence about whether Christopher participated in the robbery. A48:8-15; A58:12-14. Moreover, Pooter was not an unbiased witness—he was testifying in exchange for a recommendation for a reduced sentence. A43:6-9.

Like Pooter's testimony, the rest of the Government's case merely puts Christopher in proximity to evidence of the robbery. Evidence of a robbery was found in the Infiniti, but that is plausibly explained by the fact that Christopher is

19

the brother and companion of the robbery's organizer, Charles. Christopher's DNA did turn up on bullets in the gun left in the PNC, but Christopher explained in his statement that he had loaded the gun but not used it. Ex. 49 at 16:10-20. A rational jury could accept that account, particularly because there was no evidence of Christopher's DNA on the gun itself. Finally, Christopher's two alibi witnesses contradicted the Government's evidence and put Christopher at home while the robberies took place. A94-103, A104-A114.

The jury did not have to believe these innocent explanations for the Government's evidence. The evidence of the Credit Union incident, however, surely tipped the scale to the Government's side. Because of the district court's decision, the jury learned that a mask was recovered from the woods near another bank, just weeks after the PNC robbery, after the police had received a call concerning suspicious behavior. The jury could then infer that Christopher had worn a mask and possibly attempted a robbery of *another* bank just weeks after the PNC robbery. Whether the jury would have found Christopher guilty without that evidence is impossible to know, but evidence of the later incident without question made the Government's case more persuasive.

This Court reached just that conclusion in *United States v. Owens*, 424 F.3d 649 (7th Cir. 2005). Owens was found guilty of robbery based on three pieces of evidence: his fingerprint was found on the demand note passed by the robber to the teller, a cooperating witness—testifying in exchange for a reduced prison sentence—and his family members fingered Owens as the robber, and Owens had committed a

prior robbery at the same bank years prior. *Id*. at 652. That last fact was forbidden propensity evidence, and this Court held that the district court's allowing it before the jury was not harmless error. *Id*. at 657. This Court found that notwithstanding the "physical evidence tying [Owens] to the demand note," "the average juror would likely look elsewhere for evidence to corroborate" the testimony of the "far from disinterested lineup" of witnesses, in which case the propensity evidence "may very well have taken on a central role." *Id*. at 656. Just as in *Owens*, the jurors in this trial heard from a non-disinterested witness and saw some inconclusive physical evidence. Just as in *Owens*, the propensity evidence may have colored the jurors' perceptions and caused them to choose the Government's story over Christopher's.

Christopher's alibi and the reasonable bases for doubting the Government's evidence distinguish this case from *Clark*, 774 F.3d 1108. In *Clark*, this Court found a district court's failure to "spell out its reasons for admitting . . . Rule 404(b) evidence" to be harmless error. *Id*. at 1116. Clark was charged with robbing a bank in Indianapolis and escaping in a blue Crown Victoria. *Id*. at 1110. Days earlier, he had been picked up on surveillance cameras casing a nearby credit union. *Id*. He admitted to being the individual in the credit union video, but denied being present at the bank. *Id*. at 1116. The district court admitted the surveillance video and various details about Clark's prior actions at the credit union without assessing the evidence under Rule 404(b). *Id*. This Court found the error harmless, because Clark was identified as the bank robber by his appearance (the robber's description at the bank was a near identical match to Clark's appearance in the credit union

video), and by DNA found on plastic bags left by the robber at the bank and in the getaway car that was used both at the credit union and the bank. *Id.* at 1115. Removing the propensity evidence still left conclusive evidence identifying Clark as the robber. Removing the propensity evidence from Christopher's case, by contrast, would leave the jury with a choice on which reasonable minds could differ.

### 2. *A Limiting Instruction Could Not Cure the Prejudice*

The district court did not give a limiting instruction concerning the 404(b) evidence. The record does not reveal why. The Proposed Jury Instructions contained a generic limiting instruction about propensity evidence. Dkt. 55 at 17. But that instruction was omitted from the final instructions read to the jury. Dkt. 69-1, A119:10-A138:10. The final instruction conference was held off the record in the court's library, and so there is apparently no record of why the instruction was excluded. A115:11-23. The district court did reject a 404(b) limiting instruction earlier in the trial, but that instruction related to different evidence, not the Credit Union incident. A90:7-A92:24.

At all events, a limiting instruction would have been futile. Limiting instructions identify the permissible use of evidence and tell the jury not to consider the impermissible propensity use. *See, e.g.*, *Miller*, 673 F.3d at 702 n.1 (explaining method for crafting a useful limiting instruction). The fact that suspicious people were seen near the Credit Union had *no* relevance other than to convince the jury that Christopher had robbed or attempted to rob other banks. *Supra* 17-18. No instruction could "limit" this evidence to its proper scope; it had none! *Cf. Miller*, 673 F.3d at 702 n.1 ("If a suitable explanation cannot be drafted without invoking a

propensity inference, the evidence may not in fact be admissible."). Under the circumstances, no appropriate limiting instruction could be given.

## II.   THE TWO-LEVEL ENHANCEMENT FOR RECKLESS ENDANGERMENT DURING FLIGHT WAS PLAIN ERROR

The district court applied a two-level enhancement to Christopher's offense level for "reckless endangerment during flight" under U.S.S.G. § 3C1.2. Dkt. 88 at SA22-25. The district court based this enhancement on two events: the police chase of the Infiniti and Christopher's flight on foot after the Infiniti crashed. SA24. Neither is sufficient. A passenger in a car must actively participate in a chase—by encouraging the driver, for example—for the enhancement to apply. The enhancement also does not apply to flight on foot, unless the runner engages in some other reckless conduct.

### A.   Standard of Review

Christopher's trial counsel objected to the enhancement on the basis that the evidence did not show that Christopher was a passenger in the Infiniti. SA22. That objection to the sufficiency of the Government's evidence is enough to preserve his current argument on appeal, in which case findings of fact and application of guidelines are reviewed for clear error and questions of law are reviewed *de novo*. *United States v. Johns*, 732 F.3d 736, 740 (7th Cir. 2013) ("[A] defendant need not present a 'fully developed or even well-articulated' objection to preserve it for appeal."); *United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008) (holding that a defendant may advance "new twist[s] . . . based upon additional authority" to arguments made in the district court). Even if it was not, application of the reckless

endangerment Guideline was plain error.  Plain error review requires that Christopher show that the district court erred, the error was plain, and the error affected his substantial rights.  *United States v. Doss*, 741 F.3d 763, 768 (7th Cir. 2013) (finding district court's application of a sentencing guideline enhancement was plain error).

### B.    The Enhancement Cannot Apply to the Car Chase in Which Christopher Was a Passenger

The district court plainly erred by applying the reckless endangerment enhancement to Christopher.  Section 3C1.2 is a two-level increase that applies "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from" the police.  U.S.S.G. § 3C1.2.  The Application Notes state that "the defendant is accountable for [his] own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused."  *Id.*, Application Note 5.

Consistent with the Guideline and the Application Note, every Circuit Court to consider the issue has held that "[t]o apply this enhancement to a passenger based on the driver's reckless conduct, the district court must specifically find that the passenger 'was responsible for or brought about the driver's conduct in some way.'"  *United States v. Byrd*, 689 F.3d 636, 640 (6th Cir. 2012) (quoting *United States v. Young*, 33 F.3d 31, 32-33 (9th Cir. 1994)).[4]  "Knowingly participating in an

---

[4] *Accord United States v. McCrimon*, 788 F.3d 75, 79 (2d Cir. 2015); *United States v. Johnson*, 694 F.3d 1192, 1196 (11th Cir. 2012); *United States v. Cespedes*, 663 F.3d 685, 690 (3d Cir. 2011); *United States v. Chong*, 285 F.3d 343, 346 (4th Cir. 2002); *United States v. Conley*, 131 F.3d 1387, 1390 (10th Cir. 1997).

armed robbery in which getaway vehicles are part of the plan *is insufficient as a matter of law*, without more, to allow a district court to impose this enhancement" on passengers. *United States v. Franklin*, 321 F.3d 1231, 1237 (9th Cir. 2003) (emphasis added).

Because of "the plain meaning of the provision's language and the widespread agreement among [the] circuits," the Second Circuit has held that it is plain error to apply the Guideline to a passenger of a fleeing car without evidence that the passenger encouraged the driver to speed or otherwise drive recklessly. *McCrimon*, 788 F.3d at 79. In *McCrimon*, the defendant had left the scene of a robbery and proceeded directly to a getaway car driven by his co-defendant. *Id.* at 77. The district court held that "it was sufficient that McCrimon could have reasonably foreseen that his co-defendant would drive the getaway car in a manner that would recklessly endanger others." *Id.* The Second Circuit disagreed and found that the district court had plainly erred. *Id.* at 79.

The district court made no findings that Christopher encouraged the car chase or participated in any of the ways listed by Application Note 5. SA19-21. The district court's application of the Guideline was thus error, and as *McCrimon* shows, the error was plain. Indeed, unlike in *McCrimon* the district court did not even make a finding that Charles' flight was reasonably foreseeable to Christopher. Finally, the error affected Christopher's substantial rights by increasing his offense level, resulting in an improper guideline range. *Doss*, 741 F.3d at 768.

25

### C.     The Enhancement Cannot Apply to the Flight on Foot

To the extent the district court applied the reckless endangerment enhancement based on Christopher's subsequent flight on foot, that too was plain error.  "[I]nstictive flight on foot from law enforcement is insufficient on its own to justify the application of section 3C1.2."  *United States v. Reyes-Oseguera*, 106 F.3d 1481, 1483 (9th Cir. 1997); *see also United States v. Gould*, 529 F.3d 274, 277-78 (5th Cir. 2008) (holding that mere fact of running away did not trigger the guideline).  This Court has not directly examined the guideline's application to a flight on foot, but it has held that "[t]o obtain the adjustment the government must show that the defendant did more than merely flee; the guideline requires 'additional conduct' that creates a substantial risk of serious injury."  *United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003) (citing *Reyes-Oseguera* with approval).

The Government made no showing of conduct by Christopher that created a substantial risk of injury.  Indeed, when questioning an officer involved in the chase, the Government elicited the fact that the Infiniti crashed just three blocks from ███████ ███████ implying that Christopher's flight covered a very short distance.  A62:5-11.  Thus, even if the district court had intended to apply the enhancement for Christopher's flight on foot, it plainly erred.

### III.     THE FOUR-LEVEL ENHANCEMENT FOR USE OF A FIREARM "IN CONNECTION WITH" ANOTHER FELONY WAS PLAIN ERROR

The district court also erroneously imposed a four-level enhancement under U.S.S.G. §2K2.1(b)(6)(B) for use of a firearm "in connection with another felony offense."  SA28.  Again, the district court based this on the car chase with the

Infiniti—the Government asserted that fleeing a police officer is a felony—which contained guns at the time. That decision was wrong for two reasons. First, the Government failed to prove that Christopher was culpable in the alleged felony—the car chase. Second, the enhancement applies only when a gun facilitates or has the potential to facilitate the other felony, not when its presence is simply accidental or coincidental, as it was here.

### A.     Standard of Review

Christopher objected to this enhancement on the basis that the evidence was insufficient to place him in the car. SA30. Again, that objection to the sufficiency of the Government's evidence is enough to preserve Christopher's arguments on appeal, in which case findings of fact and application of guidelines are reviewed for clear error and questions of law are reviewed *de novo*. *Johns*, 732 F.3d at 740; *Billups*, 536 F.3d at 578. Even if it was not, application of the reckless endangerment Guideline was plain error.

### B.     The Enhancement Should Not Apply Because Christopher Did Not Commit "Another Felony"

The district court should not have imposed the enhancement for use of a firearm in connection with another felony, because Christopher did not commit the predicate felony of resisting law enforcement. The district court concluded that Christopher used a firearm in connection with IC 35-44.1-3-1, "resisting law enforcement." SA30. That statute makes it a felony to flee a police officer using a vehicle. IC 35-44.1-3-1(b)(1)(A). But Christopher was not driving the vehicle, and there is no evidence that he aided or abetted Charles in the car chase. Nor is there

even any evidence that he and Charles conspired to commit a crime that required a getaway car or escape. Christopher thus did not commit "another felony." *Cf. Davis v. State*, 835 N.E.2d 1102, 1111 (Ind. Ct. App. 2005) (finding passenger liable for fleeing on a showing that he acted "in concert" with the driver in committing a robbery and subsequently fleeing).[5]

The district court's error was plain. It was undisputed that Christopher was not driving the Infiniti during the chase. And it is hornbook criminal law that aiding and abetting liability requires participation and intent to make the crime succeed. *See, e.g.*, *Rosemond v. United States*, 134 S. Ct. 1240, 1248 (2014) (citing *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). This enhancement required something more than Christopher's presence in the Infiniti, but on this subject the record is barren.

The error affected Christopher's substantial rights. It increased his offense level by four levels, resulting in an improper Guideline range. *Doss*, 741 F.3d at 768.

## C.     The Enhancement Should Not Apply Because the Firearms in the Infiniti Were Not Used in Connection with the Flight

The district court's application of section 2K2.1(b)(6)(B) was erroneous for a second reason: The guns in the car were not used "in connection with" the flight from the police. Christopher's attorney did not object on this ground in the district court, so this Court reviews for plain error.

---

[5] Flight on foot is not a felony under Indiana law. IC 35-44.1-3-1(a)(3). So Christopher's alleged flight from the crashed vehicle would not support application of this enhancement.

The Guidelines state that use or possession of a gun "in connection with" another felony is when "the firearm . . . facilitated, or had the potential of facilitating, another felony offense." U.S.S.G. §2K2.1 Application Note 14(A). A gun is not used "in connection with" another felony when its presence "is simply accidental or coincidental." *United States v. McNeair*, 523 F. App'x 258, 259 (4th Cir. 2013) (*per curiam*). Interpreting similar language from the Armed Career Criminal Act, the Supreme Court has held that a gun is not used "in relation to" another offense when its "presence is coincidental or entirely 'unrelated' to the crime." *Smith v. United States*, 508 U.S. 223, 238 (1993) (interpreting 18 U.S.C. §924(c)(1)).[6]

The district court found that the guns in the Infiniti facilitated the car chase, because "[t]he Defendant knew that if he was caught with the gun he would be guilty of felon in possession of a firearm." SA30. That finding confuses "facilitates" for "motivates." A defendant who flees because he does not want the police to discover his gun is not using the gun in the flight. Quite the opposite. The defendant seeks to keep his possession of the gun hidden.

This error was plain after the Supreme Court's paired decisions in *Smith*, 508 U.S. 223 and *Watson v. United States*, 552 U.S. 74 (2007). In *Smith*, the Court— interpreting §924(c)(1)—held that "a criminal who trades his firearm for drugs 'uses' it during and in relation to a drug trafficking offense." *Smith*, 508 U.S. at 241. Watson considered the opposite transaction—a trade of drugs for a firearm.

---

[6] This Court looks to 18 U.S.C. §924(c)(1) when interpreting §2K2.1(b)(6)(B). *United States v. Schmitt*, 770 F.3d 524, 539 (7th Cir. 2014).

*Watson*, 552 U.S. at 76. The Court concluded that receiving a firearm in a trade is not "use" of the firearm. *Id*. at 79. The implication of *Watson* is that desiring a gun and then acquiring it is not use. Accordingly, Christopher did not use a gun during the flight of the Infiniti, even if it motivated the flight in the first instance.

Section 2K2.1 also applies if the defendant "possessed" the gun in connection with the other felony. But motivating a car chase is not the same as "facilitating" it, as the Application Note requires. "Facilitate" means "to make easier or less difficult." A141-143. Under the district court's analysis, the guns made the Infiniti chase more likely, but no easier.

The fact that the gun did not make the flight easier distinguishes this case from the long line of cases that hold that a gun facilitates drug offenses because it "embolden[s]" the owner to carry out the transaction. *See, e.g.*, *United States v. LePage*, 477 F.3d 485, 489 (7th Cir. 2007). Those cases reason that in some crimes, such as drug trafficking, criminals own guns to protect their money and drugs if deals go sour. *See United States v. Wyatt*, 102 F.3d 241, 248 (7th Cir. 1996). Accordingly, the guns "facilitate" the deals, which the dealers find easier to make with protection handy. Guns are "tools of the trade," and this Court permits an inference that when a gun is near drugs, it has the emboldening effect that permits the deal to go forward. *Id*. (quotation marks omitted).

The district court made no factual finding that the passengers in the Infiniti were emboldened in their escape attempt by the presence of guns. And unlike drug trafficking cases, there is no basis to draw an inference that guns are "tools of the

trade" in fleeing from police. To draw that inference, one would have to assume that occupants of the fleeing vehicle feel that escape is more likely if they can shoot at or threaten to shoot at the police. Data on police chases is sparse, but shootouts in police chases are apparently so rare that studies on the outcomes of police chases do not even report them as a category (as opposed to "crash," "escape," etc.). A146, A166. Another study found that only 10% of people who flee the police did so because they possessed a weapon, suggesting that the presence of a gun is not a tool of the trade but a random event. A153.

This case is unlike those in *United States v. Montgomery*, 599 F. App'x 594 (7th Cir. 2015) and *United States v. Suggs*, 624 F.3d 370 (7th Cir. 2010). In each of those cases, this Court found that a defendant had used or possessed a firearm in connection with flight from the police. But in each of those cases, the defendant had drawn his gun, suggesting an active use of the weapon during flight. *See Montgomery*, 599 F. App'x at 595; *Suggs*, 624 F.3d at 375. There is no evidence that Christopher drew a gun during the car chase.

## <u>CONCLUSION</u>

This Court should reverse and remand for a new trial. Alternatively, this Court should vacate Christopher's sentence and remand for resentencing.

31

August 5, 2015                    Respectfully submitted,


                                  <u>/s/Justin B. Weiner</u>
                                  Justin B. Weiner
                                      *Counsel of Record*
                                  MOLOLAMKEN LLP
                                  300 N. LaSalle Street
                                  Chicago, IL 60654
                                  (312) 450-6700 (telephone)
                                  (312) 450-6701 (fax)
                                  jweiner@mololamken.com

                                  *Counsel for Defendant-Appellant*
                                  *Christopher R. Seals*

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(a)(7)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,366 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Cir. R. 32(b) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

August 5, 2015                              /s/Justin B. Weiner
                                            Justin B. Weiner

## <u>CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)</u>

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) is in the appendix bound with this brief.  Counsel further certifies that all material required by Circuit Rule 30(b) is in the separate appendix, except for Trial Exhibit 39, which is an audio recording which cannot be bound in an electronically-filed appendix.  Counsel will submit copies of Trial Exhibit 39 on compact disc along with the required paper copies of the appendix.


August 5, 2015                              <u>/s/Justin B. Weiner</u>
                                            Justin B. Weiner

No. 15-1372

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

CHRISTOPHER R. SEALS,

*Appellant*,

V.

UNITED STATES OF AMERICA,

*Appellee*.

Appeal from the United States District Court
for the Northern District of Indiana
(Hon. Theresa L. Springmann, No. 13-cr-00046)

## REQUIRED SHORT APPENDIX OF APPELLANT
## CHRISTOPHER R. SEALS

Justin B. Weiner
  *Counsel of Record*
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 450-6700 (telephone)
(312) 450-6701 (facsimile)
jweiner@mololamken.com

*Counsel for Appellant*
*Christopher R. Seals*

## SHORT APPENDIX – TABLE OF CONTENTS

Page

May 7, 2014 Order Denying Objection to 404(b) Evidence (Dkt. 47) ..................... SA1

Excerpts of Transcript of Jury Trial, Day 2 (Denying Renewed 404(b))
    Objection ........................................................................................ SA13

February 19, 2015 Order Denying Defendant's Objections to PSR and
    Sustaining Government's Objections .............................................. SA17

Excerpts of Transcript of Sentencing Hearing ...................................... SA32

Judgment (Feb. 23, 2015) ..................................................................... SA40

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:13-CR-46-TLS |
| | ) | |
| CHRISTOPHER R. SEALS | ) | |

## OPINION AND ORDER

Defendant Christopher R. Seals is charged with armed bank robbery, brandishing a firearm during and in relation to a crime of violence, and being a felon in possession of a firearm. This matter is before the Court on the Government's Notice Pursuant to Rule 404(b)(2) [ECF No. 29], filed on October 4, 2013, and Supplement to Notice Pursuant to Rule 404(b)(2) [ECF No. 31], filed on October 15, 2013. An evidentiary hearing was held on November 6, 2013. The Government filed a Brief in Support of Admissibility [ECF No. 38] on January 17, 2014. The Defendant objected to the Government's Notice and filed a response on March 3, 2014 [ECF No. 44]. On March 17, 2014, the Government replied [ECF No. 45].

## BACKGROUND

According to the Government's recitation of the facts of this case, on February 14, 2013, three masked individuals entered the PNC Bank, located at 5610 Coventry Lane, Fort Wayne, Indiana, and robbed the bank at gunpoint. The robbers approached from the back of the bank and entered through the front door. Two wore dark, hooded sweatshirts and black masks with small eyeholes pulled down over their faces and one had a backpack. The robber with the backpack was carrying a gun as he went to the first teller station behind the teller counter, but the robber appeared to leave it on the floor by a teller's chair before entering the vault, as seen by

**SA1**

surveillance video. He was not carrying a gun when he exited the vault. The three robbers left the bank through the back door.

Immediately after the robbery, a revolver was found near one of the wheeled legs of the teller's chair. It was loaded with Remington .38 special ammunition. DNA samples taken from the cartridges matched the DNA of the Defendant to a reasonable degree of scientific certainty. A cellular telephone was also taken during the robbery from one of the victim employees. It was later recovered from a remote area along the suspected getaway route. A latent fingerprint recovered from the phone was identified as having been made by Deyante Stephens, also known by the nickname "Pooter."

About a month later, on March 13, 2013, several masked individuals were seen crawling through the wooded area behind the Bluffton Road branch of Three Rivers Federal Credit Union. At about 9:05 AM, shortly after the lobby opened, a customer informed bank employees that he noticed some suspicious things in the woods while driving through the parking lot. He saw two people lurking behind trees. He made another pass and noticed an individual wearing a white hockey mask with a black ski mask underneath. After informing bank employees, the bank manager looked out the back door and saw two men wearing ski masks "army-style crawling" toward the credit union in the snow. The bank manager stated that the suspect in darker clothing wore a black ski mask that appeared to be made of a sock or knit cloth material. The customer warned other customers and walked behind the bank to get a better view of the suspects. He noticed two suspects closer to the bank and a third farther back in the woods, but the suspects turned and ran away into the woods after they had been surprised by the customer.

Police officers responded to the Three Rivers Federal Credit Union with a trained and certified police tracking dog who helped the officers recover a white hockey mask and a black

cloth mask in the midst of a trail of footprints coming and going from the area of the bank. Despite the cold weather and falling snow, the black ski mask was warm to the touch and dry when it was collected into evidence. The black ski mask was made of a knit cloth or stocking cap with hand-cut eyeholes. It was submitted for DNA analysis. Two samples from the mask as well as a hair with root material matched the DNA profile of the Defendant to a reasonable degree of scientific certainty.

Seven days later, on March 20, 2013, officers were involved in the pursuit of a black Infiniti sedan which was associated with the Defendant and his brother, Charles Seals. Fort Wayne Police Department (FWPD) Officer Michael Bell spotted the Infiniti with at least two occupants, in the driver and front passenger seats. When Officer Bell activated his emergency lights, the Infiniti took off from the scene. A high-speed pursuit ensued, ending with a crash of the Infiniti. Two suspects bailed out of the car and ran. A man named Nadir Armour was left behind in the back seat of the Infiniti. The two fleeing suspects were not located.

Crime scene technicians executed search warrants on the Infiniti and located the following evidence: a loaded Smith and Wesson pistol between the driver's seat and the door opening; a white cellphone under the gun; a black cellphone on the passenger side floor; and a photocopy of the Defendant's identification card and the driver's carbon copy of a traffic citation issued to the Defendant in the front console. Additionally, in the back seat area, the officers located a black knit hat with hand-cut eyeholes, a bag containing a plastic bag of money, several boxes of ammunition in different calibers, and other items. The bag of money consisted of 531 one-dollar bills and 700 ten-dollar bills. There was a box of 9mm Luger ammunition, a box of Remington .38 special ammunition, a box of .45 caliber ammunition, and some 410 ammunition which could fit a .45 caliber gun. The officers found a dark blue, hooded sweatshirt, along with

3

other clothing items, in the trunk.

A latent fingerprint was located on the gun from the Infiniti and identified as the fingerprint of the Defendant. Another latent fingerprint on the driver's door window was identified as the fingerprint of the Defendant's brother, Charles Seals. Downloaded data from the white cellular telephone indicated communications with "Pooter." There were numerous communications and emails identifying the phone as belonging to Charles Seals. The black cellular telephone contained conversations about the acquisition of guns. A scanner radio application had been installed on the phone on February 13, 2013. Numerous communications identified the black cellular phone as belonging to the Defendant.

The Defendant was identified as a suspect for the PNC Bank robbery after DNA results were received from the gun left behind at the PNC Bank. The Defendant was interviewed by police on May 1, 2013. The Defendant was shown a photograph of the gun and identified it as being the gun used in the PNC robbery, but claimed his knowledge was based on television news coverage. He denied ever seeing the gun in person. He later admitted that the gun was a .38 but denied that his DNA would be found on any PNC evidence. After Special Agent Stewart showed the Defendant the DNA report regarding the gun abandoned at the PNC Bank, the Defendant switched his story and admitted buying, touching, and loading the gun prior to the bank robbery. He also admitted that the black cellphone recovered in the Infiniti belonged to him and provided the numeric code to unlock the telephone. As the interview continued, the Defendant's story continued to change, and he admitted that his involvement in the bank robbery was to keep quiet, with "Pooter" and Charles Seals giving him some money when they came back and telling him to say nothing. The Defendant admitted that Charles Seals asked him to rob this bank with him about three days before Valentine's Day but that the Defendant was too scared to do it.

4

**SA4**

On May 22, 2013, the three-count Indictment was filed in this case. Count 1 of the Indictment charges that on or about February 14, 2013, the Defendant by force, violence, and intimidation, did knowingly take from the person and presence of another, money belonging to and in the care, custody, control, management, and possession of PNC Bank, and in committing such offense, did assault and put in jeopardy the life of another person by the use of a dangerous weapon, in violation of 18 U.S.C. § 2113(a) & (d) and 18 U.S.C. § 2. Count 2 charges that the Defendant knowingly brandished, carried, and used a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). Count 3 charges the Defendant for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

The Government has provided notice that it intends to offer evidence obtained during the search of the woods behind the Three Rivers Federal Credit Union as direct evidence of the charges in the Indictment. Specifically, the Government seeks to admit the black ski mask found in the woods. The Government argues the ski mask, which contained the Defendant's DNA, looks like the same mask used by the robber who left his gun in the PNC Bank robbery and that a jury could reasonably conclude that the mask from the woods was worn by one of the PNC robbers.

The Government acknowledges that Rule 404(b) and other crimes evidence is implicated by the circumstances surrounding the recovery of the mask. From the Government's perspective, the masked individuals sneaking up behind the Three Rivers Federal Credit Union was not normal behavior for someone who was not planning a robbery. The Government also notes the similarities in tactics, in that three robbers dressed in dark, hooded sweatshirts and masks approached the bank from the rear, just after the bank opened, less than a month after the PNC Bank robbery.

5

**SA5**

On the assumption that the DNA found on the mask is accurate and indeed matches the Defendant's DNA profile to a reasonable degree of scientific certainty, the Defendant does not object to the admissibility of the mask. However, the Defendant objects to any evidence or testimony concerning the finding of the mask in the woods beyond a simple description of when and where the mask was found. The Defendant argues that there is insufficient evidence to support a jury finding that an attempted robbery occurred at the Three Rivers Federal Credit Union and that the Defendant was one of the actors. The Defendant also argues that the circumstances surrounding the discovery of the mask, the approach to the bank by the masked individuals, is unfairly prejudicial because the intent to rob the bank is too speculative. The Government argues that a jury could reasonably conclude that the conduct of the masked individuals, including army-style crawling behind the bank in a ski mask with hand-cut eyeholes, was an attempted robbery and not mere innocent meandering in the general vicinity of the bank. Further, that the Defendant's DNA profile was found on the mask, including a hair with root material matching the Defendant's DNA profile, is strong evidence that the Defendant wore the mask and was one of the individuals crawling behind the bank. However, it its Reply Brief, the Government indicated that it is merely seeking the admission of facts surrounding the police response to the credit union and discovery of the mask with the Defendant's DNA, which was similar to the masks seen in the PNC Bank surveillance video. The Government does not intend to offer evidence describing the actions of the masked individuals in the woods as an attempted robbery.

The Government also indicated in its Notice that it intends to offer evidence from the Infiniti as direct evidence that the Defendant was a perpetrator of the PNC robbery, as well as evidence related to the occupants' flight from police. The Government argues that even though

**SA6**

the officers could not identify the Defendant as one of the individuals who fled from the crashed

car, the presence of many of the Defendant's belongings creates an inference that he was in the

front passenger seat and possessed the other items found in the car. The data gathered from the

black cellular telephone indicated, and the Defendant admitted in an interview, that the phone

was his. The Government contends the installation of a police scanner application on the phone

the day before the PNC Bank robbery, the Defendant's identification card photocopy, the carbon

copy traffic ticket issued directly to the Defendant, and the Defendant's fingerprint found on the

gun located by the driver's side door creates a strong connection between the Defendant and the

items found in the car, by which a jury could reasonably and appropriately infer that the

Defendant was in possession of the bag containing money and ammunition. The bag contained a

significant number of one-dollar and ten-dollar bills and a box of ammunition that was the same

brand and caliber of ammunition that was loaded in the revolver left behind at the PNC bank.

The Government argues a jury could reasonably infer the Defendant possessed proceeds from the

PNC bank robbery.

  The Defendant argues that there is not enough evidence to connect him with the items

recovered in the Infiniti. First, the Defendant argues that there is insufficient evidence to

conclude the Defendant was inside the vehicle at the time it fled Officer Bell. The Defendant

contends that officers observed "at least two individuals" in the car and found Nadir Armour in

the crashed car, but that there is no evidence that any officer observed two suspects exit the

vehicle. The Defendant argues it is speculative to say two people fled from the car and that

evidence of the pursuit, which the Government intends to offer to demonstrate consciousness of

guilt, may apply to the driver, Charles Seals, and to Nadir Armour, whom the Defendant claims

were the only occupants of the car. The Defendant argues that the presence of some items

7

belonging to the Defendant inside the car does not sufficiently prove he was in the vehicle when it fled from the police or that he ran from the vehicle when it crashed. Second, the Defendant argues the items found in the car should not be admissible because there is no evidence that the Defendant was in the vehicle during the pursuit. The Defendant contends that the fact that his brother was the likely driver of the vehicle explains why some of his items were left in the car, which could have been left in the car sometime prior to the vehicle pursuit.

The Government responds that the 1,231 bills, data from the telephones, the ammunition, and other items are relevant evidence to the PNC Bank robbery and were found in conjunction with items in the recent possession of the Defendant. Furthermore, the Government contends the evidence identifies him as the fleeing front seat passenger from the car. The Government argues a cell phone is commonly carried by people on a daily basis rather than being stored in a vehicle, and that data from the black cell phone, which the Defendant acknowledges belonged to him and required a code to unlock, indicates that it was recently used and possessed by the Defendant at the time of the vehicle flight and crash. To the Government, the large number of bills commonly held in a bank but not in a form commonly carried by a person, the mask with hand-cut eyeholes, the gun, and the same brand of .38 caliber ammunition are highly probative as evidence of the PNC Bank robbery. Furthermore, the Government contends the installation of the police scanner application on the Defendant's phone the day before the PNC Bank robbery, which can be useful to avoid apprehension and arrest, is sufficient to support a reasonable conclusion that the Defendant was the front seat passenger and that his flight from these items demonstrates consciousness of guilt.

## ANALYSIS

Federal Rule of Evidence 404(b)(1) provides that evidence of other crimes, wrongs, or acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See United States v. Garcia-Avila*, 737 F.3d 484, 490 (7th Cir. 2013) ("Rule 404(b) bars the admission of evidence of a crime, wrong, or other act committed by a defendant when it is used to show a defendant's propensity to commit a crime, or to show that he or she acted in conformity with that propensity on the occasion in question." (citation and internal quotation marks omitted)). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). A four-part test is used to determine if 404(b) evidence is admissible. "Evidence is admissible if (1) the evidence is directed towards establishing a matter other than the defendant's propensity to commit crimes charged, (2) the other act is similar and close enough in time to be relevant, (3) the evidence is sufficient to support a jury finding that the defendant committed the other act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Garcia-Avila*, 737 F.3d at 490. The first and fourth factors are of particular importance, and the Court must pay close attention to the reason why the evidence is offered. *See United States v. Lee*, 724 F.3d 968, 975–76 (7th Cir. 2013).

There can be no doubt that the mask and the items in the Infiniti directly address whether the Defendant was a participant in the PNC Bank robbery. That is, it is circumstantial evidence of the crime charged, and not propensity evidence. *See, e.g.*, *United States v. Miller*, 673 F.3d 688, 695 (7th Cir. 2012). The Defendant is free to argue that these items do not establish his participation in the PNC Bank robbery. The circumstances surrounding the discovery of these

9

items is the issue. The evidence of the suspicious activity at the Three Rivers Federal Credit Union occurred less than a month (27 days) after the PNC Bank robbery. One week later (7 days), the Infiniti fled and crashed, leading to the discovery of the evidence contained inside. The Defendant argues, under the third prong, that there is insufficient evidence to support a jury finding that the Defendant committed the similar act and, under the fourth prong, that the danger of unfair prejudice substantially outweighs the probative value of the evidence.

As to the third prong, other acts evidence is relevant only if the jury can reasonably conclude that the act occurred and that the Defendant was the actor. *Huddleston v. United States*, 485 U.S. 681, 689 (1988). The mask located in the woods behind the Three Rivers Federal Credit Union contained the Defendant's DNA profile, including a hair with root material. The evidence establishes that this mask was still warm when found, surrounded by fresh footprints in the snow, and that it was not itself covered in snow although it was snowing at the time. A jury could reasonably conclude the Defendant was the individual wearing the mask that morning. The probative value of the evidence is very high, as it goes toward identifying the Defendant as wearing the mask. However, to reduce the risk of unfair prejudice, the details of the masked individuals' behavior prior to the arrival of the police will not be admitted. But the fact that police responded to the area of the Three Rivers Federal Credit Union to investigate suspicious behavior, and recovered a mask with the Defendant's DNA, is admissible.

With respect to the Infiniti, a jury could reasonably conclude that the Defendant was the front seat passenger of the car when it fled from police and that he was in possession of the items found in the car. The photocopy of his identification card and the traffic ticket suggest he was a recent occupant and was not merely storing them in the car. The more substantial evidence supporting the Defendant as the front seat passenger is the presence of his cell phone. The

Case: 15-1372   Document: 22   Filed: 09/18/2015   Pages: 88

Defendant acknowledged the phone was his and provided the code to unlock the phone to police. Although it is possible to have forgotten the phone in the car, the data from the phone indicates its recent use on the night in question. A jury could reasonably infer that the Defendant had his cell phone in his possession that night but left it behind as he fled from the scene of the car crash. A jury will be free to consider the Defendant's argument that his brother's presence in the car explains the presence of his personal effects, and that he was not actually in the car prior to the police pursuit.

The Defendant argues that it would be unduly prejudicial to allow a jury to hear that the Infiniti was involved in numerous shootings because a jury would jump to the conclusion that the Defendant was involved in shootings and is therefore dangerous. The Government, however, does not intend to admit evidence related to the Infiniti's suspected connection with shootings. The items discovered in the Infiniti are highly probative of the Defendant's involvement in the charged offense. Because the most prejudicial evidence related to the Infiniti—the reason police were pursuing the Infiniti in the first place—will not be admitted, the probative value is not substantially outweighed by the risk of unfair prejudice. The focus remains on the items discovered, not other bad acts that suggest the Defendant's character.

Ultimately, it will be the Government's burden to prove, beyond a reasonable doubt, that the Defendant was a participant in the February 14, 2013, PNC Bank robbery. The discovery of the mask and the items inside the Infiniti are highly probative to establishing his guilt. Some context explaining how police came into possession of these items is necessary to present a complete picture to the jury and this context is not so prejudicial, when weighed against the probative value, as to warrant its exclusion.

**CONCLUSION**

For the reasons stated above, the Court OVERRULES the Defendant's objections and

determines that the Government's evidence—namely, the black ski mask discovered behind

Three Rivers Federal Credit Union and the evidence discovered in the Infiniti sedan, including

the context necessary to explain how the police came into possession of these items, is

admissible.

SO ORDERED on May 7, 2014.


 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

12

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

UNITED STATES OF AMERICA,      )
                                )
        Plaintiff,      )
                                )
                                )CAUSE NO: 1:13-cr-46
v.                               )
                                )
CHRISTOPHER SEALS,         )DAY 2 of Proceedings
                                )Volume 2 of 4
        Defendant.      )
--------------------------------

TRANSCRIPT OF JURY TRIAL PROCEEDINGS HELD
SEPTEMBER 17, 2014, BEFORE THE
HONORABLE THERESA L. SPRINGMANN, UNITED STATES
DISTRICT COURT JUDGE

<u>APPEARANCES:</u>

FOR THE GOVERNMENT:     ANTHONY GELLER, AUSA
                            3128 Federal Building
                            Fort Wayne, Indiana  46802

FOR THE DEFENDANT:      MICHELLE KRAUS, ESQ.
                            116 W. Columbia Street
                            Fort Wayne, Indiana  46802

ALSO PRESENT:           The Defendant in person

COURT REPORTER:        TINA GALLUCCI, RMR, CRR, FCRR
                       U.S. District Court Reporter
                       1300 South Harrison Street
                       Suite 2105
                       Fort Wayne, Indiana  46802
                       (260) 423-3060
                       tina_gallucci@innd.uscourts.gov

| | |
|---|---|
| 1 | **CHRISTINE ARMSTEAD,** |
| 2 | **having been first duly sworn,** |
| 3 | **was examined and testified as follows:** |
| 4 | **DIRECT EXAMINATION** |
| 5 | BY MR. ANTHONY GELLER: |
| 6 | Q. Good morning. |
| 7 | A. Good morning. |
| 8 | Q. Could you tell us your name, please? |
| 9 | A. Christine Armstead. |
| 10 | Q. How do you spell your first and last names for the court |
| 11 | record? |
| 12 | A. C-H-R-I-S-T-I-N-E.  Last name Armstead, A-R-M-S-T-E-A-D. |
| 13 | **MS. MICHELLE KRAUS:**  Judge, before we go any further, |
| 14 | may we approach? |
| 15 | (Whereupon, the following bench conference was held |
| 16 | outside the hearing of the jury:) |
| 17 | **MS. MICHELLE KRAUS:**  She's getting into stuff -- |
| 18 | **COURT REPORTER:**  Can you please speak up. |
| 19 | **MS. MICHELLE KRAUS:**  This is now getting into the |
| 20 | stuff that was at the Three Rivers Federal Credit Union. |
| 21 | We've litigated the 404(b) issue.  I need to object to |
| 22 | preserve that for the record.  And I just want the record, |
| 23 | make sure I'm okay with this.  I'll object.  The basis for my |
| 24 | objection will be the arguments I made in the briefing to the |
| 25 | Court previously, and for appellate purposes will that be |

1    sufficient for me to preserve all of those issues.  I mean,

2    I'll show the objection but not have to go into the basis each

3    time.

4         **THE COURT:**  Is there any issue with regard to that

5    objection at this point preserving that issue?

6         **MR. ANTHONY GELLER:**  No, Judge.  We just rest

7    obviously on the previous order as far as admission.

8         **THE COURT:**  And I believe you've made an adequate

9    record in that regard, so...

10        **MS. MICHELLE KRAUS:**  Okay.

11        **MR. ANTHONY GELLER:**  I'm sorry.  Go ahead.

12        **MS. MICHELLE KRAUS:**  So what I would like to do, I'll

13   object to her testimony and that way it's sort of covers

14   everything, that way I don't have to -- my intent is not to be

15   disruptive, but --

16        **THE COURT:**  Show it as a continuing objection?

17        **MS. MICHELLE KRAUS:**  -- as a continuing objection.

18   And then will that also preserve, because there's pieces of

19   evidence that are going to come in.  Will that preserve or

20   should I object to each piece of evidence out of an abundance

21   of caution?

22        **THE COURT:**  If you want to object from counsel table

23   is usually effective without being, you know, well, if you

24   object and the Court for the same reasons stated --

25        **MS. MICHELLE KRAUS:**  Right.

**SA15**

1      THE COURT:  The Court can note it and make the

2  appropriate ruling.

3      MR. ANTHONY GELLER:  Just so I know.

4      MS. MICHELLE KRAUS:  Excuse me, sorry.

5      MR. ANTHONY GELLER:  My intention was kind of lead

6  her into, did you respond to a suspicious person's --

7      MS. MICHELLE KRAUS:  Okay.

8      MR. ANTHONY GELLER:  -- thing, so they can -- I

9  talked to her before about stay away from, you know, all the

10  things in your order, just to be careful, I'll just lead her

11  into that.

12      MS. MICHELLE KRAUS:  All right.  So for right now,

13  I'll object to her testimony on the basis of the arguments

14  that I made in the --

15      THE COURT:  404.

16      MS. MICHELLE KRAUS:  -- 404 and then as the evidence

17  comes in, I'll object from there.

18      THE COURT:  All right.

19    (Whereupon, the bench conference was concluded;

20  thereafter, the following proceedings were held in open

21  court:)

22      THE COURT:  All right.  Go ahead, counsel.

23  BY MR. ANTHONY GELLER:

24   Q. I think we left off with your name.  Did you spell your

25  name?

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:13-CR-46-TLS |
| | ) | |
| CHRISTOPHER R. SEALS | ) | |

## OPINION AND ORDER

The Defendant, Christopher R. Seals, was found guilty and convicted by a jury of armed bank robbery and aiding and abetting, violations of 18 U.S.C. § 2113(a) and 18 U.S.C. § 2 (Count 1); use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 2); and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 3). An officer with the United States Probation Office prepared a Presentence Investigation Report (PSR) in anticipation of the Defendant's sentencing. The Defendant objects to certain portions of the PSR, raising four issues: (1) whether the base offense level should be enhanced for reckless endangerment during flight; (2) whether the base offense level should be enhanced for physical restraint of a victim; (3) whether the base offense level should be enhanced for trafficking in firearms and stolen firearms; and (4) whether the Defendant possessed a firearm in connection with another felony offense.[1] The Government has a single objection: whether a four-level enhancement for possessing a firearm in connection with another felony offense is appropriate. The Court conducted an evidentiary hearing [ECF No. 87] during

---

[1] The Defendant also objects to two of the probation officer's proposed conditions of supervised release; namely, the conditions regarding third-party notification and participation in a substance abuse treatment program. On February 12, 2015, the Court issued a Notice of Proposed Conditions of Supervised Release [ECF No. 81] that declined to impose all of the conditions contained in Part F of the PSR. Because the Court's Notice declined to impose the two conditions of supervised release for which the Defendant objects, these objections are denied as moot.

which the parties presented argument regarding the propriety of the enhancements. The

objections are ripe for ruling.


## FINDINGS OF FACT

Facts relevant to sentencing should be proved by a preponderance of the evidence. *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009); *see also United States v. Krieger*, 628 F.3d 857, 862 (7th Cir. 2010) (advising that sentencing factors that do not increase the defendant's sentence beyond the statutory range may be found by the court at sentencing by a preponderance of the evidence). "A proposition proved by a preponderance of the evidence is one that has been shown to be more likely than not." *United States v. Davis*, 682 F.3d 596, 612 (7th Cir. 2012). The Federal Rules of Evidence do not apply to sentencing, *United States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005), and a court may rely on hearsay as long as the information "has sufficient indicia of reliability to support its probable accuracy," *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008) (quotation marks omitted); *see also United States v. Isom*, 635 F.3d 904, 908 (7th Cir. 2011) ("At sentencing, courts may rely on presentence reports containing even double-hearsay, i.e., statements by coconspirators to investigators, so long as those statements are reliable."). At sentencing, "a district judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" *United States v. Bautista*, 532 F.3d 667, 672 (7th Cir. 2008) (quoting *United States v. Johnson*, 489 F.3d 794, 796–97 (7th Cir. 2008)). "Sentencing judges necessarily have 'discretion to draw conclusions about the testimony given and evidence introduced at sentencing,' but 'due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations.'" *United States v. Bradley*, 628 F.3d 394,

2

400 (7th Cir. 2010) (quoting *England*, 555 F.3d at 622). "A district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information." *Rollins*, 544 F.3d at 838. "The defendant bears the burden of proving that the PSR is inaccurate or unreliable," and if he offers no evidence to question the PSR's accuracy, a court may rely on it. *Id.*

The Court conducted a four-day jury trial, beginning on September 16, 2014, and an evidentiary hearing on February 17, 2015. The Court incorporates by reference the record of this case, and will briefly recite some of the relevant facts.

On February 14, 2013, three masked individuals entered the PNC Bank, located at 5610 Coventry Lane, Fort Wayne, Indiana, and robbed the bank at gunpoint. The robbers approached from the back of the bank and entered through the front door. Two wore dark, hooded sweatshirts and black masks with small eyeholes pulled down over their faces, and one had a backpack. The robber with the backpack was carrying a gun as he went to the first teller station behind the teller counter, but the robber appeared to leave it on the floor by a teller's chair before entering the vault, as seen by surveillance video. He was not carrying a gun when he exited the vault. The three robbers left the bank through the back door.

Immediately after the robbery, a revolver was found near one of the wheeled legs of the teller's chair. It was loaded with Remington .38 special ammunition. DNA samples taken from the cartridges matched the DNA of the Defendant to a reasonable degree of scientific certainty. A cellular telephone ("cellphone") was also taken during the robbery from one of the victim employees. It was later recovered from a remote area along the suspected getaway route. A latent fingerprint recovered from the phone was identified as having been made by Deyante Stephens, also known by the nickname "Pooter."

On March 20, 2013, officers were involved in the pursuit of a black Infiniti sedan which

3

was associated with the Defendant and his brother, Charles Seals. Fort Wayne Police Department (FWPD) Officer Michael Bell spotted the Infiniti with at least two occupants, in the driver and front passenger seats. When Officer Bell activated his emergency lights, the Infiniti fled from the scene. A high-speed pursuit ensued, ending with a crash of the Infiniti. Two suspects exited the car and ran. A man named Nadir Armour remained in the back seat of the Infiniti. The two fleeing suspects were not located.

Crime scene technicians executed search warrants on the Infiniti and located the following evidence: a loaded Smith and Wesson pistol between the driver's seat and the door opening; a white cellphone under the gun; a black cellphone on the passenger side floor; and a photocopy of the Defendant's identification card and the driver's carbon copy of a traffic citation issued to the Defendant in the front console. Additionally, in the back seat area, the officers located a black knit hat with hand-cut eyeholes, a bag containing a plastic bag of money, several boxes of ammunition in different calibers, and other items. The bag of money consisted of 531 one-dollar bills and 700 ten-dollar bills. There was a box of 9mm Luger ammunition, a box of Remington .38 special ammunition, a box of .45 caliber ammunition, and 410 ammunition that could fit a .45 caliber gun. The officers found a dark blue, hooded sweatshirt, along with other clothing items, in the trunk.

A latent fingerprint was located on the gun from the Infiniti and identified as the fingerprint of the Defendant. Another latent fingerprint on the driver's door window was identified as the fingerprint of the Defendant's brother, Charles Seals. Downloaded data from the white cellphone indicated communications with "Pooter." There were numerous communications and emails identifying the phone as belonging to Charles Seals. The black cellphone contained conversations about the acquisition of guns. A scanner radio application had been installed on

4

the phone on February 13, 2013. Numerous communications identified the black cellphone as belonging to the Defendant. It was also determined that the black cellphone was used in close proximity to the time of the flight and subsequent crash of the Infiniti.

The Defendant was identified as a suspect for the PNC Bank robbery after DNA results were received from the gun left behind at the PNC Bank. The Defendant was interviewed by police on May 1, 2013. The Defendant was shown a photograph of the gun and he identified it as being the gun used in the PNC robbery, but claimed his knowledge was based on television news coverage. He denied ever seeing the gun in person. He later admitted that the gun was a .38 but denied that his DNA would be found on any PNC evidence. After Special Agent Stewart showed the Defendant the DNA report regarding the gun abandoned at the PNC Bank, the Defendant switched his story and admitted buying, touching, and loading the gun prior to the bank robbery. He also admitted that the black cellphone recovered in the Infiniti belonged to him and provided the numeric code to unlock the telephone. As the interview continued, the Defendant's story changed, and he admitted that his involvement in the bank robbery was to keep quiet, as "Pooter" and Charles Seals gave him money when they came back and told him to say nothing. The Defendant admitted that Charles Seals asked him to rob PNC Bank with him about three days before Valentine's Day but that the Defendant was too scared to do it.

A three-count Indictment was filed on May 22, 2013, and on September 19, 2014, a jury convicted the Defendant of all three counts. The addendum to the PSR indicated that the Government and the Defendant had objections to the application of various enhancements to the Defendant's base offense level as found in the PSR. On February 17, 2015, the Court held an evidentiary hearing during which the parties presented argument regarding the propriety of the enhancements. Having considered the complete record in this case and the parties' arguments,

5

**SA21**

the Court will now discuss each objection in turn.

## ANALYSIS

**A.      Enhancement for Reckless Endangerment During Flight**

The Defendant argues that the two-level enhancement for reckless endangerment during flight, pursuant to U.S.S.G. §3C1.2 and found in paragraph 27 of the PSR, is inappropriate because he was never identified as having been a passenger in the black Infiniti. The Defendant argues that he never admitted to being present in the car, and that the backseat passenger, Nadir Armour, identified Charles Seals as the driver but never identified the Defendant as being present in the car. Although the Defendant admits that his cellphone was in the car, he argues that any evidence suggesting that he was the front seat passenger in the car is merely circumstantial evidence. The Government argues that there is ample circumstantial evidence to establish that the Defendant was the front seat passenger in the car during the flight from police.

Although the pursuing officer did not visually identify the Defendant as being the front passenger seat passenger of the Infiniti, there were numerous items found in the car connecting the vehicle with the Defendant. First, a photocopy of the Defendant's identification card and the driver's carbon copy of a traffic citation issued to the Defendant were found in the front console. Second, a black cellphone was located on the passenger floorboard, and subsequent analysis of the data and communications of the phone identified it as belonging to the Defendant. Evidence presented at trial indicated recent use of the phone in close proximity to the time of the car chase and accident. At roughly the 1:57:00 to 2:05:00 mark of the recorded interview of the Defendant on May 1, 2013, he admits that his black cellphone was lost in the Infiniti, and he then provided officers with the passcode necessary to unlock the phone. Further, at the 2:07:00 mark, the

6

following exchange occurred between the Defendant and the interviewing officer.

| | | |
|---|---|---|
| Officer: | "You were with him [Charles Seals] in the crash?" |
| Defendant: | "Yeah, cause that's my car, that's why." |
| Officer: | "You weren't driving." |
| Defendant: | "I know." |
| Officer: | "Your [expletive] brother was driving. You were riding shotgun and you have Tiger [Nadir Armour] in the backseat sitting with the dufflebag." |

Other items found in the car included a white cellphone, identified as belonging to Charles Seals, and a loaded Smith and Wesson pistol, both found between the driver's seat and the door opening. A latent fingerprint taken from the gun in the Infiniti was identified as belonging to the Defendant. A black knit hat with hand-cut eyeholes, a bag containing a plastic bag of money, and several boxes of ammunition in different calibers were found in the backseat area. A dark blue, hooded sweatshirt, along with other clothing items, was found in the trunk.

The Defendant previously objected to the admissibility of this evidence, but the Court overruled the Defendant's objections in its May 7, 2014, Opinion and Order [ECF No. 47], finding that a reasonably jury could conclude that the Defendant was the front seat passenger of the car when it fled from police and that he was in possession of the items found in the car. The Court incorporates by reference its earlier Opinion and Order, and finds that the preponderance of the evidence shows that the Defendant was the front seat passenger in the Infiniti when it fled from police. The Court finds that after the Infiniti crashed, the Defendant and the driver, Charles Seals, fled from the scene on foot, leaving behind Nadir Armour in the backseat along with the various items of evidence in the car already described.

The Defendant knew, as he acknowledged in his interview, that he could not legally

7

**SA23**

possess a firearm because he was a convicted felon. The pistol found in the car, which included

the Defendant's latent fingerprint, as well as the ammunition, the items used in the robbery, and

the proceeds from the robbery all provided incentive for the Defendant to flee from the police. It

is of no consequence that the Defendant was the front seat passenger and not the driver, because

after the high speed chase and crash, the Defendant and his brother both continued to flee from

the scene and the evidence, leaving only Nadir Armour in the vehicle.

The Defendant bears the burden of showing that the PSR is not accurate or is unreliable,

and must produce evidence beyond a bare denial that calls reliability of the alleged facts into

question. *United States v. Davis*, 682 F.3d 596, 613 (7th Cir. 2012). The District Court may rely

on factual information contained in the PSR "so long as it bears sufficient indicia of reliability to

support its probable accuracy." *Id.* A bare denial by the Defendant may be enough if the PSR

contains only a "naked or unsupported charge," but only after the Defendant's evidence casts

doubt on the reliability of the facts in the PSR does the burden shift to the government to

demonstrate the accuracy of the information. *Id.*; *United States v. Moreno-Padilla*, 602 F.3d 802,

809 (7th Cir. 2010).

The Court finds that the Defendant has failed to produce evidence that reasonably

questions the reliability of the facts in the PSR. To the contrary, the Government has produced

evidence supporting the facts in the PSR that the Infiniti led police on a high-speed chase

through a residential neighborhood that ended when the vehicle crashed into two separate

vehicles on Bowser Avenue. The Court finds that the Defendant was the front seat passenger in

this Infiniti, and that the Defendant continued to flee on foot after the crash. Consequently, the

Court finds that the preponderance of the evidence shows that the Defendant's high-speed flight

from the police recklessly endangered the public and the police. As such, the two-level

enhancement for reckless endangerment during flight, pursuant to U.S.S.G. §3C1.2, is appropriate and the Defendant's objection is overruled.


**B.      Enhancement for Physical Restraint of a Victim**

The Defendant argues that the two-level enhancement for physical restraint of a victim, pursuant to U.S.S.G. §2B3.1(b)(4)(B) and found in paragraph 23 of the PSR, is inappropriate because he believes the evidence does not support the enhancement.

The Government argues that there are multiple instances of physical restraint within the record that support the enhancement. First, two bank employees were moved at gunpoint to various locations in the bank over the course of the robbery. The lead teller, Brittany Dillman, who was approximately seven months pregnant at the time, was moved from her teller station to the vault, and for a moment a gun was pointed at her stomach. The manager, Bradford Ziebell, was moved from his office to the teller station, and then to the vault. Both bank employees were then told to stay in the vault and the door was closed on them at the end of the robbery. In addition, Ziebell was placed in handcuffs. The Government argues that the forced movement around the bank, at gunpoint, is enough to support application of the enhancement notwithstanding the fact the Ziebell was placed in handcuffs and both he and Dillman were shut inside the vault.

The Government cites *United States v. Black*, 636 F.3d 893 (7th Cir. 2011), to support the proposition that the physical restraint enhancement is proper even when based on the actions of the defendant's accomplices. In *Black*, the defendant argued that his accomplice's conduct— ordering and forcing a bank teller to move to various places in the bank at gunpoint—did not constitute physical restraint because it was not similar enough to the examples of physical

9

**SA25**

restraint enumerated in the Guidelines, including tying, binding, or locking up the victim. *Id.* at 899–900. The Court of Appeals rejected this argument and found that "the fundamental characteristic of the physical restraint enhancement is to punish one for depriving a person of his freedom of physical movement, which can be accomplished by means beyond those statutory examples." In particular, the Court of Appeals reaffirmed its finding in *Taylor* that "'[w]hether a pointed gun is used to move a person into an unlocked room and keep him there, or used to move a person from one part of the robbery scene to another, the person's freedom of movement is restrained as effectively as by shoving or dragging him into a room and locking the door.'" *Id.* at 900 (quoting *United States v. Taylor*, 620 F.3d 812, 815 (7th Cir. 2010)).

The Court finds that the preponderance of the evidence shows that the victims were physically restrained during the robbery. Not only were two bank employees forced, at gunpoint, to move to various locations around the bank, both were shut inside the vault at the end of the robbery. In addition, Ziebell, the bank manager, was placed in handcuffs. These actions clearly establish that both victims were deprived of their freedom of physical movement and were thereby physically restrained. As such, the two-level enhancement for physical restraint of a victim, pursuant to U.S.S.G. §2B3.1(b)(4)(B), is appropriate and the Defendant's objection is overruled.

**C.       Enhancements for Trafficking in Firearms and Stolen Firearms**

The Defendant argues that the four-level enhancement for trafficking of firearms, pursuant to U.S.S.G. §2K2.1(b)(5) and found in paragraph 34 of the PSR, and the two-level enhancement for stolen firearms, pursuant to U.S.S.G. §2K2.1(b)(4)(A) and found in paragraph 33 of the PSR, are inappropriate because he believes there is insufficient evidence to support the

10

enhancements.[2]

The Government argues that both enhancements are appropriate based on the trial

evidence as well as statements made by the Defendant in an interview with law enforcement.

While excerpts of the interview were presented at trial, the entire May 1, 2013, interview was

admitted into evidence as Government's Exhibit 55 during the evidentiary hearing. As for the

firearms being stolen, the Government argues that the Defendant admits that the guns were

stolen because he is unable to legally purchase guns, but that he would acquire guns for use by

his brother and others at the ██████ residence. As for the trafficking of firearms, the

Government argues that the Defendant admited during the interview that he and his brother were

selling guns to co-Defendant Deyante Stephens and others.

The Court has reviewed the interview of the Defendant and finds that the preponderance

of the evidence shows that the Defendant trafficked in firearms and had possession of stolen

firearms. During the interview, the officers asked the Defendant numerous times about guns.

When asked if he knew the guns were stolen, the Defendant answered "yeah," and when asked

why he bought stolen guns, the Defendant responded "I can't get [any] regular guns," a reference

to his status as a convicted felon. (Gov't Ex. 55 at 52:00–56:00.) Later, the Defendant

acknowledged that he would buy a lot of stolen guns, citing a need for protection because

"people shoot at us, trying to kill us." (*Id.* at 2:06:00–2:06:30.) The Defendant also informed

officers that he set up the deals to buy the stolen guns as well as sell the guns, and that he and his

associates would keep about five to six guns available at the ██████ residence. (*Id.* at

---

[2] The Addendum to the PSR mentions only an objection to trafficking of firearms and not to stolen firearms. However, because the parties discussed the issue of whether the firearms were stolen during their arguments at the February 17, 2015, evidentiary hearing, the Court will also address the potential stolen firearms objection.

11

**SA27**

Case: 15-1372    Document: 22    Filed: 08/18/2015    Pages: 88

52:00–57:00, 1:33:00–1:34:00.) The Defendant has not produced any evidence to question the

facts in the PSR. Meanwhile, the Government has produced evidence establishing the credibility

of the facts as laid out in the PSR. Consequently, the Court finds that the preponderance of the

evidence shows that on multiple occasions the Defendant bought and sold stolen firearms. As

such, the four-level enhancement for trafficking of firearms, pursuant to U.S.S.G. §2K2.1(b)(5),

and the two-level enhancement for stolen firearms, pursuant to U.S.S.G. §2K2.1(b)(4)(A), are

appropriate and the Defendant's objection is overruled.


**D.    Enhancement for Possession of a Firearm in Connection with another Felony Offense**

Finally, the Government argues that a four-level enhancement for possession of a firearm

in connection with another felony offense, pursuant to U.S.S.G. §2K2.1(b)(6)(B), is appropriate

in this case. The Defendant argues that this enhancement is inappropriate because it is already

covered under the Guideline calculations based on the Defendant's conduct.

U.S.S.G. §2K2.1(b)(6)(B) provides for a four-level enhancement if the defendant "used

or possessed any firearm or ammunition in connection with another felony offense; or possessed

or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it

would be used or possessed in connection with another felony offense." The guidelines

commentary explains that "in connection with" means the enhancement applies if the firearm

facilitated, or had the potential of facilitating, another felony offense. U.S.S.G. §2K2.1, cmt.

n.14. The guidelines commentary further explains that "[i]f the defendant used or transferred one

of such firearms in connection with another felony offense (*i.e.*, an offense other than a firearms

possession or trafficking offense) an enhancement under subsection (b)(6)(B) also would apply."

U.S.S.G. §2K2.1, cmt. n.13(D).

The addendum to the PSR indicates that the probation officer did not include an enhancement for possession of a firearm in connection with another felony offense for two reasons. First, the probation officer noted that the firearms in this case were possessed or trafficked. Specifically, the probation officer determined that the Defendant's conviction for being a felon in possession of a firearm pursuant to 18 U.S.C. § 924(c) (Count 3) precluded application of the firearm involved in the bank robbery towards this enhancement. Second, the probation officer cited *United States v. Johns*, 732 F.3d 736 (7th Cir. 2013), for the proposition that it is impermissible double counting to apply a trafficking enhancement and an increase for knowledge that the weapon would be used in connection with another felony offense where the enhancements are based on the same conduct.

In *Johns*, the Seventh Circuit found that the district court erred in applying the other felony offense enhancement because the other felony enhancement and the trafficking enhancement were based on the same conduct—John's transfer of the firearms to the Confidential Informant (CI) with knowledge that the CI was going to resell the firearms—and was impermissible double counting, which is expressly prohibited by Application Note 13(D) to §2K2.1. *Id.* at 740. The Government argues that the rule in *Johns* is inapplicable because it is not seeking to use the same offense conduct, namely trafficking, for both enhancements. Rather, the Government argues there are multiple other felonies which provide the support for application of the enhancement. First, the Government argues that the Defendant admitted to acquiring a community supply of guns for his buddies at the ███ residence, who were also felons, which were used at various shootings and other crimes they wanted to commit. Second, the Government argues that the Defendant admitted to supplying a gun to his brother, Charles, and

13

**SA29**

selling a gun to Deyante Stephens, both of whom are felons. Third, the Government argues that

the car chase involving the Infiniti was resisting law enforcement with a vehicle, which is a

felony offense.

The Defendant argues, similar to the enhancement for reckless endangerment during

flight, that only circumstantial evidence supports a finding that the Defendant was the front seat

passenger in the Infiniti. For reasons already discussed, the Court finds that the preponderance of

the evidence shows that the Defendant was the front seat passenger in the Infiniti and was in

possession of the items located inside the car. Although the presence of other items, such as the

proceeds from the bank robbery, would encourage the Defendant to flee, the Smith and Wesson

pistol found between the front driver's seat and the door opening is of particular relevance with

respect to the other felony enhancement. A latent fingerprint taken from the gun was identified as

belonging to the Defendant. As the Defendant acknowledged in his interview, he was aware that

he could not legally possess a firearm. The Court finds that the firearm both facilitated, and had

the potential to facilitate, another felony offense. The Defendant knew that if he was caught with

the gun he would be guilty of felon in possession of a firearm, a felony offense. The record

reflects that the Infiniti fled from police in a high-speed chase before it crashed, and then the

occupants of the driver and front passenger seats continued to flee on foot. As already stated, the

Court finds that these two individuals were the Defendant and his brother, Charles. As already

determined, the Defendant led police on a high-speed chase that recklessly endangered the public

and placed others in substantial risk of bodily injury. In Indiana, it is a felony offense to resist

law enforcement by fleeing in a vehicle. I.C. § 35-44.1-3-1. Hence, the Defendant's flight from

the police in the Infiniti was another felony offense. The Court finds that the presence of the gun

and the ammunition in the vehicle facilitated, or had the potential of facilitating, the other felony

offense of resisting law enforcement through flight in a vehicle.

The burden is on the Defendant to produce evidence bringing these facts into question. While the Government provides ample evidence of the Defendant's involvement with guns, the Defendant offers no evidence to question the reliability of the Government's evidence. Therefore, the four-level enhancement for possession of a firearm in connection with another felony offense, pursuant to U.S.S.G. §2K2.1(b)(6)(B), is appropriate and the Defendant's objection is overruled. For the same reasons, the Government's objection is sustained.

### CONCLUSION

For the foregoing reasons, the Defendant's objections to the PSR are OVERRULED. The Government's objection to the PSR and request for an enhancement for possession of a firearm in connection with another felony offense is SUSTAINED.

SO ORDERED on February 19, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

UNITED STATES OF AMERICA,     )
                     )
        Plaintiff,     )
                     )
                     )CAUSE NO: 1:13-cr-46
v.                       )
                     )
CHRISTOPHER SEALS,        )
                     )
        Defendant.     )
--------------------------------

TRANSCRIPT OF SENTENCING HEARING HELD
FEBRUARY 23, 2015, BEFORE THE
HONORABLE THERESA L. SPRINGMANN, UNITED STATES
DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:     TINA NOMMAY, AUSA
                            3128 Federal Building
                            Fort Wayne, Indiana  46802

FOR THE DEFENDANT:       MICHELLE KRAUS, ESQ.
                            116 W. Columbia Street
                            Fort Wayne, Indiana  46802

ALSO PRESENT:             The Defendant in person

COURT REPORTER:         TINA GALLUCCI, RMR, CRR, FCRR
                            U.S. District Court Reporter
                            1300 South Harrison Street
                            Suite 2105
                            Fort Wayne, Indiana  46802
                            (260) 423-3060
                            tina_gallucci@innd.uscourts.gov

1    provided him with a copy as well, Judge.

2          **THE COURT:**  And with regard to the objections that

3    were previously filed in, were there any other objections that

4    should be noted at this point with regard to the report or

5    addenda?

6          **MS. MICHELLE KRAUS:**  No, ma'am.

7          **THE COURT:**  All right.  Mr. Seals, did you have

8    sufficient time to review the presentence report and the

9    addenda, and discuss the contents of those documents with your

10   lawyer sometime before today's hearing?

11         **THE DEFENDANT:**  Yes.

12         **THE COURT:**  The presentence report and the addenda

13   have been placed in the record under seal.  It's directed that

14   if an appeal is taken, counsel on appeal shall be permitted

15   access to the sealed report.

16       It's further directed that counsel on appeal are not

17   permitted access to the recommendation section of that report,

18   which has been filed as a separate docket entry.

19       The addenda to the presentence report indicates that the

20   Government had one objection to the presentence report.  That

21   was whether a 4-level enhancement for possessing a firearm in

22   connection with another felony offense is appropriate.

23       The defendant raised the following objections to the

24   report:  First, that the base offense level should not be

25   enhanced for reckless endangerment during flight.  Second,

1    that the base offense level should not be enhanced for

2    physical restraint of a victim.  Third, that the base offense

3    level should not be enhanced for trafficking in firearms and

4    stolen firearms.  And four, that the base offense level should

5    not be enhanced for possession of a firearm in connection with

6    another felony offense.

7        On February 19th, 2015, the Court issued an opinion and

8    order overruling the defendant's objections and sustaining the

9    Government's objection and request for an enhancement for

10   possession of a firearm in connection with another felony

11   offense.

12       Given the Court's ruling with regard to those objections

13   and issues, counsel, would you agree that there are no

14   remaining legal or factual issues in dispute as to the

15   presentence report, Ms. Nommay?

16           **MS. TINA NOMMAY:**  Government would agree, Your Honor.

17           **THE COURT:**  Ms. Kraus?

18           **MS. MICHELLE KRAUS:**  Yes, ma'am.

19           **THE COURT:**  Let me ask you, counsel, now, are there

20   any matters to discuss that relate directly to the calculation

21   of the advisory guidelines, Ms. Nommay?

22           **MS. TINA NOMMAY:**  No, Judge.

23           **THE COURT:**  Ms. Kraus?

24           **MS. MICHELLE KRAUS:**  We have nothing further.

25           **THE COURT:**  There being no objections to the

1    Probation Officer's conclusions as to the applicable

2    guidelines, the Court adopts those conclusions.

3        The application of the advisory guidelines results in the

4    following calculations:  This involves a total offense level

5    of 34, a criminal history category of 3, a range of months of

6    imprisonment with regard to Count One from 188 to 235 months.

7    With regard to Count Two, 7 years of imprisonment to run

8    consecutive to Count One.  With regard to Count Three, 120

9    months of imprisonment to run concurrent with Count One.

10   There is no eligibility for probation.  There would be a range

11   of supervised release between 2 to 5 years as to Counts One

12   and Two; a range of 1 to 3 years of supervised release with

13   regard to Count Three; a fine range between $25,000 to

14   $250,000.  Restitution in the amount of $96,534.37, and a

15   special assessment of $300, that being the total amount given

16   $100 of special assessment on each count of conviction.

17       Counsel, are these calculations correct, Ms. Nommay?

18           **MS. TINA NOMMAY:**  They are, Your Honor.

19           **THE COURT:**  Ms. Kraus?

20           **MS. MICHELLE KRAUS:**  I believe so, Judge.

21           **THE COURT:**  At this time, let me ask the Government,

22   were there any victims who are present in the courtroom today

23   that wish to be presented or noted by the Government to the

24   Court before we go further in sentencing?

25           **MS. TINA NOMMAY:**  Your Honor, there are several

**SA35**

1    he's a big brother, and Chris is with him, that doesn't mean

2    that Chris has any control over what Charles is doing as far

3    as that high-speed chase was concerned.

4        I think that, for those reasons, sentencing him to the low

5    end, the 188 months, along with about the 7 years in Count 2,

6    again, would adequately punish him for -- it is a serious

7    offense.  He scared people incredibly through his involvement.

8    My recollection from the trial is it was pretty unclear --

9    there were clearly 3 people that went into the bank, but sort

10   of unclear who did what once they were inside there.  So

11   again, I think that the 188 months plus the 7 years would

12   adequately punish him.

13       **THE COURT:**  I'll state the sentence now, but I'll

14   give counsel a final opportunity to make any legal objections

15   before it's finally imposed.

16       In determining a particular sentence to be imposed the

17   Court must consider the nature and circumstances of the

18   offense and the history and characteristics of the defendant,

19   and the Court must impose a sentence that is sufficient, but

20   not greater than necessary to comply with the purposes of

21   punishment set forth in Title 18 of the United States Code,

22   Section 3553(a).

23       The Court must also consider many of these same factors,

24   as well as those in 18 U.S.C., Section 3583(d) in determining

25   the conditions of supervised release.

1    After a careful review of the presentence report, and in

2    consideration of all the evidence, and the presentation made

3    on the part of the defense, as well as the parties or

4    counsel's arguments, the Court concludes that a sentence of

5    188 months on Count One, with 2 years of supervised release, 7

6    years for Count Two to be served consecutively to Count One

7    with 2 years of supervised release to be served concurrently

8    with Count One, and 120 months for Count Three, to be served

9    concurrent with Count One with 2 years of supervised release,

10   to be served concurrently with Count One is sufficient, but

11   not greater than necessary to comply with the purposes of

12   punishment.

13    I find that the conditions of supervision to be imposed

14   reasonably relate to the nature and circumstances of the

15   offenses of conviction, to the history and characteristics of

16   Mr. Seals, and to the purposes of sentencing, other than

17   punishment; that they involve no greater deprivation of

18   liberty than reasonably necessary for the relevant purposes of

19   sentencing, and that, where applicable, they are consistent

20   with the policy statements of the Sentencing Commission.  The

21   reasons supporting the conditions were presented in this

22   Court's notice that was filed into the record on February

23   12th, 2015 and those reasons are incorporated herein.

24    Accordingly, it would be the judgment of the Court that

25   the defendant, Christopher R. Seals, be hereby committed to

1    the custody of the Bureau of Prisons for the term of 188

2    months in Count One; 120 -- excuse me, 120 months in Count

3    Three to be served concurrently, and 84 months on Count Two.

4    Count Two is to be served consecutive to Counts 1 and 3.

5        The defendant shall be placed on 2 years of supervised

6    release.  This term consists of concurrent terms of 2 years in

7    Counts One, Two and Three.

8        While the defendant is on supervised release pursuant to

9    this judgment, the defendant shall comply with the following

10   conditions as required by Title 18 of the United States Code,

11   Section 3583(d):

12       The defendant shall not commit another federal, state, or

13   local crime during the period of supervision;

14       The defendant shall not unlawfully possess a controlled

15   substance;

16       The defendant shall refrain from any unlawful use of a

17   controlled substance;

18       The defendant shall submit to a drug test within 15 days

19   of release on supervision;

20       The defendant shall submit to at least two periodic tests

21   thereafter, for use of a controlled substance;

22       The defendant shall cooperate in the collection of a DNA

23   sample from the defendant, if the collection of such a sample

24   is authorized pursuant to Section 3 of the DNA analysis

25   Backlog Elimination Act of 2002 at 42 United States Code,

Defendant: CHRISTOPHER R SEALS
Case Number: 1:13CR46-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **one hundred eighty-eight (188) months as to Count One (1); eighty-four (84) months as to Count Two (2) to be served consecutively to Counts One (1) and Three (3); and one hundred twenty (120) months as to Count Three (3) to be served concurrent to Count One (1).**

The Court makes the following recommendations to the Bureau of Prisons:

1. That the defendant be incarcerated at the federal facility located as close to Atlanta, Georgia, as possible.

2. That the defendant be evaluated for enrollment in a General Equivalency Degree Preparation Program (GED).

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

Defendant delivered _____3.25-15_____ to _USP McCreary_ at _Pine Knot, Ky_ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By: _____
DEPUTY UNITED STATES MARSHAL

15 APR 23 AM 11: 40

FILED

2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NUMBER: 1:13CR46-001** |
| **Plaintiff,** | **USM Number: 12950-027** |
| **vs.** | |
| **CHRISTOPHER R SEALS** | **MICHELLE F KRAUS** |
| **Defendant.** | **DEFENDANT'S ATTORNEY** |

## JUDGMENT IN A CRIMINAL CASE

**THE DEFENDANT** was found guilty on Counts One (1), Two (2) and Three (3) of the Indictment following trial by jury on 9/16 – 9/19/2014.

**ACCORDINGLY,** the Court has adjudicated that the defendant is guilty of the following offenses:

| Title, Section & Nature of Offense | Date Offense Ended | Count Numbers |
|---|---|---|
| 18:2113(a) and (d): ARMED BANK ROBBERY; 18:2: AIDING AND ABETTING | February 14, 2013 | 1 |
| 18:924(c): USE OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE | February 14, 2013 | 2 |
| 18:922(g)(1): FELON IN POSSESSION OF A FIREARM | February 14, 2013 | 3 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

February 23, 2015
_____
Date of Imposition of Judgment

s/ Theresa L. Springmann
_____
Signature of Judge

Theresa L. Springmann, United States District Judge
_____
Name and Title of Judge

February 23, 2015
_____
Date

Defendant: CHRISTOPHER R SEALS
Case Number: 1:13CR46-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **two (2) years as to Count One (1); two (2) years as to Count Two (2); two (2) years as to Count Three (3), all counts to be served concurrently.**

## CONDITIONS OF SUPERVISED RELEASE

**While the defendant is on supervised release pursuant to this Judgment, the defendant shall comply with the following conditions as required by 18 U.S.C. § 3583(d):**

1.  The defendant shall not commit another Federal, State, or local crime, during the period of supervision.

2.  The defendant shall not unlawfully possess a controlled substance.

3.  The defendant shall refrain from any unlawful use of a controlled substance.

4.  The defendant shall submit to a drug test within 15 days of release on supervision.

5.  The defendant shall submit to at least two periodic tests thereafter for use of a controlled substance.

6.  The defendant shall cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2002, 42 U.S.C. § 14135a.

**In addition, while the defendant is on supervised release pursuant to this Judgment, the defendant shall comply with the following discretionary conditions as provided by 18 U.S.C. §§ 3563(b)(1)–(23) and 3583(d):**

7.  The defendant shall remain within the jurisdiction of the court, unless granted permission to leave by the Court or a probation officer.

8.  The defendant shall report to the probation officer as directed by the Court or the probation officer.

9.  The defendant shall answer inquiries by a probation officer pertaining to his supervision and notify the probation officer within 48 hours of any change in residence or change of employer.

10. The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.

11. The Defendant shall support his dependent as required by law. Failure to pay child support shall not be grounds for imprisonment as a violation of these conditions of supervised release.

12. The defendant shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession

3

**SA41**

or territory of the United States, requiring payments by the defendant for the support and maintenance of a child or of a child and the parent with whom the child is living.

13. The Defendant shall make restitution to the victim of the offense under 18 U.S.C. § 3556 (but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A)), as follows:

PNC Bank $96,534.37

14. The defendant shall maintain employment at a lawful occupation, unless excused by the probation officer for acceptable reasons (e.g., schooling, training, childcare, eldercare, disability, age, or serious health condition) or shall pursue a course of study or vocational training that will equip the defendant for employment at a lawful occupation.

15. The defendant shall not meet, communicate, or otherwise interact with a person whom he knows to be engaged, or is planning to be engaged, in criminal activity.

16. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.

17. The defendant shall perform 20 hours per week of community service, not to exceed 400 hours, if the defendant is unemployed for a time period exceeding 60 days within the first year of supervised release.

18. The defendant shall permit a probation officer to visit him at home, place of employment, or at a counseling or treatment center between the hours of 8:00 AM to 8:00 PM. A probation officer can make an oral or written request to the court to allow for an alternative time period or place for the visit.

**In addition, while the defendant is on supervised release pursuant to this Judgment, the defendant shall comply with the following discretionary conditions as provided by U.S.S.G. §5D1.3:**

19. The defendant shall not physically, voluntarily, and intentionally be present at a place that he knows or has reason to know that controlled substances are illegally sold, used, manufactured, distributed, or administered.

20. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.

21. The Defendant shall be prohibited from incurring new credit charges or opening additional lines of credit without approval of the probation officer unless the Defendant is in compliance with the installment payment schedule imposed for payment of restitution and/or a fine.

22. The Defendant shall make restitution in accordance with 18 U.S.C. §§ 3663A and 3664. The Defendant's default on the payment of restitution may result in revocation and penalties being ordered under 18 U.S.C. § 3613A.

23. The Defendant shall pay the special assessments imposed in accordance with 18 U.S.C. § 3013. The Defendant's default on the payment of the special assessments may result in revocation and penalties being ordered under 18 U.S.C. §§ 3013(b) and 3613.

4

24. The Defendant shall provide a probation officer with specific financial information regarding the Defendant's ability to pay restitution, upon a written or oral request by a probation officer, made to and approved by the Court. The request must be prompted by the Defendant's failure to comply with a payment schedule ordered for a period of 60 consecutive days, and the request must describe the specific financial information needed for determining the Defendant's current ability to pay.

25. Within the first year of supervision, the Defendant shall participate in the General Equivalency Degree (GED) Preparation Course.

The defendant is advised that, pursuant to 18 U.S.C. §3583(e)(2), his non-mandatory conditions of supervision are subject to modification where appropriate. Modification may be requested by the defendant or the probation officer upon written request. Such modification may be requested in light of any changed circumstances. A request for a modification may require a hearing before the Court.

## CRIMINAL MONETARY PENALTIES

The Court **ORDERS** the defendant to pay restitution to the U.S. District Court Clerk's Office, 1108 E. Ross Adair Courthouse, 1300 South Harrison Street, Fort Wayne, IN 46802, which shall be due immediately, to be disbursed to the following victim:

PNC Bank   $96,534.37

The restitution obligation shall be paid in joint and several liability with the following related defendant:

Deyante Stephens        Case No.: 1:13CR48-1

The Court finds that the defendant does not have the ability to pay interest and waives the imposition of interest in this case due to the defendant's inability to pay.

The Court **ORDERS** the defendant to pay the special assessments of $300 ($100 per count) U.S. District Court Clerk's Office, 1108 E. Ross Adair Courthouse, 1300 South Harrison Street, Fort Wayne, IN 46802, which shall be due immediately.

The Court finds that the defendant does not have the ability to pay a fine and waives the imposition of a fine in this case due to the defendant's inability to pay.

| Total Assessment | Total Fine | Total Restitution |
|---|---|---|
| $300 | NONE | $96,534.37 |

5

**SA43**

USDC IN/ND case 1:13-cr-00046-TLS-CAN document 94 filed 02/23/15 page 6 of 6

Defendant: CHRISTOPHER SEALS
Case Number: 1:13CR46-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A.  Lump sum payment of $96,834.37 due immediately; in accordance with B and C below;

B.  Payment to begin immediately; in accordance with C below;

C. Restitution shall be paid at a minimum rate of $50.00 per month commencing 30 days after placement on supervision until said amount is paid in full.

The defendant may make payments for his financial obligations imposed herein from any wages he may earn in prison in accordance with the Bureau of Prisons Financial Responsibility Program, although participation in that program is voluntary. The defendant should note that failure to participate in the Financial Responsibility Program while incarcerated may result in the denial of certain privileges to which he might otherwise be entitled while imprisoned, and that the Bureau of Prisons has the discretion to make such a determination. Any portion of the defendant's financial obligations not paid in full at the time of the defendant's release from imprisonment shall become a condition of supervision.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order:  (1) assessment, (2) restitution.

6

**SA44**

## **CERTIFICATE OF SERVICE**

I certify that today, September 18, 2015, I electronically filed the foregoing Redacted, Public Version of the Opening Brief and Required Short Appendix of Appellant Christopher R. Seals with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


September 18, 2015                        /s/Justin B. Weiner
                                          Justin B. Weiner